**Robert and Francis ETCHELL, Plaintiffs,**

v.

**ROYAL INSURANCE CO., et al., Defendants.**

**No. C–94–1061 SBA.**

United States District Court, N.D. California.

Jan. 18, 1996.

Edwin W. Wilson, Sayre & Wilson, Healdsburg, CA, for plaintiffs.

Richard S. Gilardi, Jennifer M. Hutcheson, Lunch, Loofbourrow, Gilardi & Grummer, San Francisco, CA, for defendants.

## REPORT & RECOMMENDATION RE FEES AND COSTS

BRAZIL, United States Magistrate Judge.

### INTRODUCTION

Earlier this year Judge Armstrong ruled that Safeguard wrongfully denied a tender by the Etchells of an underlying state court action. The District Court further ruled that because of that wrongful denial, Safeguard was obligated to reimburse the Etchells for fees and costs reasonably incurred in their defense in the tendered matter. Judge Armstrong did not purport to fix the conceptual scope of the reimbursement obligation. Nor did she determine the amount owing. Instead, she referred those matters to the Chief Magistrate Judge for assignment. Subsequently the matter was referred to me.

After continuing (at the request of counsel) the hearing date I originally had set, I conducted an evidentiary hearing on October 27, 1995. In the course of the hearing it became clear that I would need additional submissions. I received additional evidentiary submissions in early November and in early December, and am now in a position to complete the Report and Recommendation that follows.

This Report is lengthy for several reasons. First, the underlying proceedings were multi-faceted and poorly described by counsel—forcing me to work through voluminous records from two state court actions (one of which spanned almost six years) and from deliberations before the Healdsburg City Council. Second, Safeguard's challenges have raised several major issues of substantive coverage law that have not been addressed by California courts—forcing me to conduct extensive legal research and to attempt to extrapolate guiding principles from the most proximate authorities I could find. Third, because the law on which some of the parties' disputes turn is unsettled, there is a greater likelihood than there otherwise would be that the District Court will conclude that California courts would follow different legal courses than those I have charted. Should that happen, I want Judge Armstrong to have as full a portrait of the underlying facts as possible—so that she will be positioned to apply the legal tests that she believes are appropriate without further proceedings.

Because this Report is so long I have divided it into the following sections:

**I. FINDINGS OF FACT: THE UNDERLYING EVENTS AND PROCEEDINGS**

A. Developments Prior to the Filing of the Underlying Action for Legal and Equitable Relief (the 'Main' Action) (p. 6)

B. The First Few Months of the Main Action (p. 9)

C. The Eminent Domain Proceedings (p. 16)

D. The Main Action from mid–1990 through mid–1995 (p. 28)

E. The Tenders and Safeguard's Responses (p. 42)

**II. JUDGE ARMSTRONG'S RULING ON THE DUTY TO DEFEND (p. 46)**

**III. THE ETCHELLS' ADJUSTED CLAIM AND THE REASONABLENESS OF THE HOURLY RATES**

A. The Size of the Adjusted Claim (p. 48)

B. The Reasonableness of the Hourly Rate (p. 49)

## IV. SAFEGUARD'S CHALLENGES TO CLAIMED FEES AND COSTS

A. Pre-tender Expenses (p. 55)

1. The *Gribaldo—Faust* Line of Authority (p. 57)

2. Sec. 554 of California Insurance Code (p. 64)

3. Waiving Defects in Notice by Denying Coverage (p. 68)

4. Third Party Claims and the Requirement of Prejudice (p. 76)

B. Expenses Incurred After the Court of Appeal Reversed the Damages Award (p. 80)

C. Fees for Researching a Possible Appeal to the Supreme Court on the Issue of Public Dedication (p. 81)

D. Allocation Between the Main Action and the Eminent Domain Proceedings (p. 83)

E. Allocation Between Defense of the Main Action and Prosecution of the Cross–Complaint (p. 97)

F. Allocation Between Covered and Non–Covered Claims Against the Etchells in the Main Action (p. 102)

G. Allocation Between Defense of the Etchells and Defense of the Delagnes (p. 111)

## V. SUMMARY OF FINDINGS AND RECOMMENDATIONS (p. 119)

1. The findings made in this Report are based on more than 2,000 pages of documents, most from the underlying proceedings, and on testimony at the October 27, 1995, hearing from Edwin Wilson, Hans W. Herb, Susan Carbone, and Frances Etchell. Mrs. Etchell's testimony was extremely limited in scope: confined to clarifying the status of a trust account set up by or for the Delagnes. Ms. Carbone's testimony also was quite limited, focusing almost exclusively on hourly rates paid by Safeguard to lawyers in the Bay Area. She offered no substantial testimony about Safeguard's handling of the Etchells' tenders.

 While this evidentiary base is sufficient for purposes of resolving most of the parties' disputes about the fees and costs matters referred to me, it would not be sufficient for resolving their dispute about whether Safeguard's handling of the tenders constituted "bad faith." Moreover, because the "bad faith" issue was not the subject

## I. FINDINGS OF FACT: THE UNDERLYING EVENTS AND PROCEEDINGS [1]

As noted above, I have sub-divided this section to facilitate comprehension of the multi-faceted factual setting in which we must apply the law. Before turning to the details, a brief overview will be useful.

Robert and Frances [2] Etchell and Gilbert and Marianne [3] Delagnes opposed proposed uses of part of Borel road by Al and Samantha Blasi and Wright Investment, Inc., who wanted to make improvements in the road and to run utility lines along it to service a residential development they had underway (called Bella Vista Villa). The Etchells and the Delagnes first tried to block the Blasis' execution of these plans through agencies of local government in Healdsburg. Then they resorted to physical self-help. That led the Blasis to file the first of the underlying lawsuits (No. 177104), which sought both damages and equitable relief (the "main" action).

Shortly after filing that suit, the Blasis began seeking permission from the Healdsburg City Council to initiate judicial proceedings to condemn the disputed portion of the roadway to public use. After securing that permission (which took several months), the Blasis filed the second of the underlying cases, the eminent domain (condemnation) action (No. 179390). These two formally separate cases proceeded on roughly parallel time tracks for a while—and at one point a

of the evidentiary hearing that I conducted, I had no occasion to hear much of the evidence (testimonial, in particular) that would be relevant to a fair disposition of the bad faith claim. It follows that the section in the text that describes the Etchells' tenders and Safeguard's responses to them cannot purport to be a comprehensive account—and the factual findings made there, because they are not based on all the potentially pertinent evidence, should neither be considered definitive nor given any collateral estoppel effect in any subsequent proceedings.

2. Mrs. Etchell's first name is mistakenly spelled "Francis" in many of the documents.

3. In many of the papers filed in the underlying actions Mrs. Delagnes first name is mistakenly spelled "Mary Ann".

Superior Court Judge held a joint hearing in both cases.

The Etchells first tendered defense of the main action to Safeguard in early September of 1990, 11 months after the Blasis had filed the suit. Over time, developments in the main action eliminated the need for further prosecution of the eminent domain matter. Eventually, the Etchells and the Delagnes filed a cross-complaint against the Blasi plaintiffs in the main action.

Trial of the main action was bifurcated— the liability phase being completed about a year before the damages phase was completed. The Etchells and the Delagnes appealed the adverse trial court judgment—and in the end persuaded the Court of Appeal to reverse the large damages award against them (the quiet title and injunctive relief that the Blasis had won remained intact). Closure in the main action was not reached until mid 1995, when time to appeal to the California Supreme Court expired.

Aided by this brief overview of the underlying proceedings, we can begin the more detailed examination made necessary by the issues the parties have raised.

## A. Developments Prior to the Filing of the Underlying Action for Legal and Equitable Relief (the 'Main' Action)

The Etchells and the Delagnes were neighbors and owned (separately) real properties adjacent to an extension of Borel Road in the City of Healdsburg, Sonoma County.

In April of 1987 the Etchells purchased a homeowners insurance policy from the defendant in this action, Safeguard (also known as Royal) Insurance Company.

In 1989 Al and Samantha Blasi, along with Phillip Wright, were attempting to develop property they owned that was adjacent to parts of Borel Road. The Blasis and Mr. Wright were working on this project through Wright Investment, Inc., dba Bella Vista Villa. In the remainder of this Report I will refer to the Blasis, Phillip Wright and Wright Investment, Inc. collectively as the "Blasi plaintiffs" or, simply, "the Blasis".

The Blasi claimed (through a recorded deed) to own an easement in a portion of Borel Road. They also claimed that this deed-based right entitled them to install utilities along the road and to make improvements in it. The Delagnes had used the same portion of the roadway for some thirty years to get into and out of their property— and claimed an easement at least for that purpose. The Etchells also claimed to have easement rights in the roadway.

In May of 1989 the City of Healdsburg approved the Blasi's subdivision plans. "Those approved plans called for [the Blasis] to install underground utilities along Borel Road, including the roadway parcel, and to pave the road." Opinion by the California Court of Appeal, First Appellate District, Division Four, in the appeal of Sonoma County Super.Ct. No. SCV 177104 [the main underlying action], filed April 10, 1995, at p. 2, attached as the last of the unnumbered exhibits in the separately bound (spiral) packet of exhibits submitted by the Etchells as "Response to October 30, 1995 Order Re Evidentiary Hearing," received by my chambers on November 3, 1995.

Early in the summer of 1989 the Etchells began approaching Healdsburg officials to express concern about the implications of the development project for the portion of Borel Road in which the Etchells claimed an interest and for the trees that lined that portion of the road. By early July of that year attorney Edwin Wilson was working with the Etchells and the Delagnes to try to persuade the City not to permit the Blasis to expand the road or to install utilities or harm the trees there. *See* Clerk's Transcript on Appeal, *Blasi v. Etchell*, Superior Ct. No. SCV–177104 (cited hereafter as "Clerk's Trans."), Vol. I, 000204. *See also* City of Healdsburg Records re Bella Vista Request for Consent for Filing Action in Eminent Domain, Ex. 5, at 30 (presented to the Court in a separate binder on December 7, 1995; this binder is cited hereafter as "City Records").

About July 13, 1989, Gilbert and/or Marianne Delagnes, accompanied by Edwin Wilson, presented to the assessor's office a claim that Mr. Delagnes was the owner of the disputed portion of Borel Road. The Delagnes persuaded the assessor to assign a

parcel number to the disputed piece of property, but the assessor continued to consider ownership of the lot undetermined (at least until late in the fall of 1989, when Wilson and Robert Etchell apparently persuaded the assessor to list Robert Etchell, for tax purposes, as the owner of the parcel). *See* City Records, Ex. 3, at p. 5; Ex. 5, at p. 30; and. Ex. 20.

In August Wilson approached the developers directly on behalf of both the Etchells and the Delagnes, demanding that the Blasi/Wright group immediately desist from their efforts to install the utilities. Wilson threatened litigation if necessary. Clerk's Trans., Vol. I, at 000207.

When this direct demand failed to deter the Blasis, Wilson, on behalf of the Etchells, pressed the Healdsburg City Council, City Manager, and City Attorney to intervene. *Id.* at 000111. These efforts, undertaken in September of 1989, also failed. The local officials concluded that they could not prevent the owners of the Bella Vista Estates from using the roadway in the manner contemplated—a use that the local officials had approved earlier that year. *Id.* at 000099.

Apparently the Etchells decided not to initiate legal action to try to block the installation of the utilities because counsel for the Blasis had warned Wilson in early September that if he tried to secure a temporary restraining order the Blasis would press the court for an order requiring the Etchells to post a large bond. *Id.* at 000200–201; *see also* City Records, Ex. 5, at 42.

With the work on the road and the utilities proceeding, and with no prospect for relief through political channels or litigation, Robert Etchell and Gilbert Delagnes decided to take matters into their own hands. On October 1, 1989, they erected a gate that blocked access to the disputed portion of Borel Road. The Blasis removed the gate the next day. Then, during the evening of October 2, 1989, Robert Etchell, this time without help from Gilbert Delagnes, reinstalled the gate and parked a vehicle behind it, thus again physically preventing the Blasis from proceeding with the installation of the utilities.

## B. The First Few Months of the Main Action

On October 5, 1989, the Blasis took this dispute to Sonoma County Superior Court. On that day they filed a complaint naming the Etchells and the Delagnes as defendants. Clerk's Trans., Vol. I, at 000001. The "Complaint for Intentional Interference with a Contract, and For a Temporary Restraining Order, Preliminary and Permanent Injunction" alleged that the Blasis were owners of an easement in the disputed roadway property, an easement that "consists of a right-of-way for general road purposes" and under which the Blasis were entitled to install utility lines for their Bella Vista Estates development. The Complaint further alleged that the defendants asserted easement rights in the roadway.

This pleading contained two causes of action, the first of which sounded formally in intentional interference with contract. The contracts with which the Etchells and the Delagnes allegedly had interfered were between the Blasis and the people to whom they had sold property in Bella Vista Estates. But the conduct that constituted the alleged interference consisted entirely of blocking (by the gate and the vehicle) the Blasis' use of the roadway and their efforts to install their utility lines along Borel Road. That same conduct was the basis for the second cause of action, which accused the Etchells and the Delagnes of wrongfully interfering with the Blasis' easement rights along Borel Road.

In this second cause of action the Blasis asked the Superior Court to issue immediately a temporary restraining order that would command the Etchells and the Delagnes to remove the gate and the vehicle and to desist from interfering with the Blasis use of the roadway 'for general road purposes' and to install utilities. The Blasis also asked for a temporary and permanent injunction to the same effect. On both causes of action they prayed for compensatory and punitive damages.

The Superior Court issued the requested restraining order the same day the Blasis' filed their Complaint: October 5, 1989. The Court also ordered the Etchells and the De-

lagnes to appear on November 17, 1989, to show cause why they should not be enjoined from interfering with the Blasis easement rights during the pendency of the Blasis' civil action.

About October 9, 1989, Robert Etchell received quitclaim deeds from Georgette Cadoul Etchell (his sister-in-law) and from Rose Zantis, deeds that purported to release to Mr. Etchell whatever ownership interests these two women had in the disputed portion of the road. City Records, Exhibits 5 (at pp. 41–42), 10 and 11.

By October 12, 1989, Wilson had filed papers, on behalf of the Etchells and the Delagnes, opposing the TRO. Clerk's Trans., Vol. I, beginning at 000044. In these papers Robert Etchell claimed to be the owner of the property which the disputed portion of Borel Road traversed—and insisted that by erecting the barriers to the Blasis' use of that part of the Road he was merely protecting his property from their unlawful encroachments. *Id.*, at 000063. Gilbert Delagnes' Declaration did not claim an ownership (fee) interest in the subject road, but did claim that he had built it to service his home and had used it for that purpose for more than 30 years. He also asserted that before they recently launched their effort to install utilities, the Blasis had rarely if ever used the disputed roadway. *Id.* at 000049.

On October 18, 1989, the Blasi plaintiffs filed their First Amended Complaint in the Superior Court action. It essentially repeated the two causes of action as set forth in the initial complaint, without adding anything significant. Clerk's Trans., Vol. I, at 000065.

About a week later, Wilson filed a substantial set of papers in support of a motion to dissolve the temporary restraining order. The Blasis simultaneously asked the Court to modify its original order to permit them to move forward with work on the roadway that they claimed was necessary to assure safe passage. On October 23, 1989, Judge Laurence K. Sawyer modified the initial TRO so that it temporarily prohibited any further removal or pruning of trees but permitted the Blasis otherwise to proceed with limited work on part of the disputed roadway, as necessary to assure safe passage. Clerk's Trans., Vol. I, at 000093–94 and 000143.

Both sides submitted extensive papers in connection with the motion for a preliminary injunction. *See id.* starting at 000184. In a Supplemental Memorandum filed on October 26, 1989, the Blasis asserted that they had a deed-based easement that entitled them to install utilities through the roadway as long as they (the Blasis) did not interfere with the defendants' (Etchells and Delagnes) use of the roadway. The Blasis further asserted that installing the utilities would cause only temporary and minimal disruption of use of the roadway and that the defendants had no legal right to interfere with this work because they did not own the roadway.

In further support of their motion for the injunction, the Blasis also pointed out that they had brought this matter before the Healdsburg City Council and that that body, on advice of the City Attorney, had concluded that the Blasis had the right to extend the utilities through the disputed portion of Borel Road. *Id.* at 000099 and Ex. B attached thereto, at 000111 (letter from City Attorney to City Manager on this subject, dated September 8, 1989).

In papers opposing the motion for the preliminary injunction, Wilson (on behalf of the Etchells and the Delagnes) framed the issue in the following terms: "The primary question now pending before the Court is whether or not a Preliminary Injunction should be issued enjoining defendants from interfering with plaintiffs' construction activities along Borel Road." According to Wilson, resolution of that key question turned on "chains of title … and the interpretation of chains of title." *Id.* at 000214.

Much of the evidence submitted by Wilson was targeted on the objective of persuading the Court that Robert Etchell was the legal owner of the disputed roadway parcel and that the chain of transfers under which the Blasis claimed the right (through easement) to install the utilities was legally defective. Wilson also argued that the fact that the Blasis had initiated a private condemnation action to secure the same rights that they claimed in the main action showed that the

Blasis knew that their asserted deed-based rights were invalid. *Id.* at 000219.

The Superior Court heard oral argument on the motion for the preliminary injunction on Nov. 7, 1989. It then took the matter under submission. Clerk's Trans., Vol. II, at 000255. While the Court worked on its ruling, the parties devoted considerable energy to the eminent domain matter, which was then pending before the Healdsburg City Council. Developments on that front are described in the next section.

Judge Sawyer filed his "Order on Preliminary Injunction" on December 14, 1995. After reporting that he was not able at this juncture to resolve the disputes between the parties about the ownership of the parcel or the easements, Judge Sawyer concluded that the fairest course was to continue the status quo (as reflected in the TRO), but with some modest adjustments, which he made in the preliminary injunction. The Court enjoined the Etchells and the Delagnes, pending trial of the case, from interfering with plaintiffs' use of their asserted easement. The Order also declared, however, that the Blasis' use of the parcel would be at their own risk (meaning they would have to pay to have the utilities removed if later the court resolved the disputed issues against them) and was to be limited to installing utilities, grading and subsurfacing of the roadbed (laying macadam on it was prohibited), and such other measures as were necessary to maintain safe passage. The Court also enjoined the plaintiffs, pending trial, from further removing or pruning trees within the parcel. *Id.* at 000263–265.

About ten days after the Court had heard oral argument on the motion for a preliminary injunction Wilson filed an Answer to the Blasis' First Amended Complaint. This pleading answered for both the Etchells and the Delagnes. In substance, this Answer denied that the Blasis had easement rights in the parcel and insisted that Robert Etchell was its legal owner, with the right to prevent the Blasis from entering or using his land without his permission. *Id.* at 000256–261.

About a month later, on December 21, 1989, the Blasis filed their Second Amended Complaint in this action. The first two causes of action essentially tracked the two causes of action that the Blasis had stated in their earlier complaints: intentional interference with contract and injunctive relief (the focus again being on the defendants' allegedly wrongful physical interference in early October with plaintiffs use of their alleged easement). The third and fourth causes of action, however, were new.

In the third cause of action, which was styled "Quite [sic] Title to an Easement against Defendant Robert Etchell," the Blasis claimed a deed-based easement right to install utilities, noted that Robert Etchell claimed to be the owner of the parcel, and asked the court to quiet title against Etchell, confirming the Blasis' right under their chain of title to install the utilities. The relief for which plaintiffs prayed on this new third cause of action was "a judgment that plaintiffs are the owner of the easement; and [t]hat defendants have no interest in the easement adverse to plaintiffs' interests." *Id.* at 000278. The fourth cause of action sounded in alleged "Negligent Interference with Economic Relationship." The factual basis for this cause of action was identical to the factual basis for the first cause of action (intentional interference with contract): the early October physical interference (by erecting the gate and leaving the vehicle in the roadway) by the Etchells and Delagnes with plaintiffs' efforts to install the utilities. *Id.* at 000276–277. The only difference between the first and the fourth causes of action was in legal theory: in the latter, the defendants were accused of acting with tortious negligence when they engaged in the physical interference.

When the Etchells and Delagnes filed their Answer to the Second Amended Complaint on January 30, 1990, they included specific denials aimed at the new causes of action. Among other things, they denied that the Blasis' alleged deed-based easement was valid, asserting that the purported conveyors did not have the easement rights that they purported to deed. *Id.* at 000296. The Etchells and the Delagnes also added to their prayer a request for a "judgment that plaintiffs are not the owners of any easement across" the disputed parcel. *Id.* at 0003000.

In part because proceedings in this litigation and in the parallel eminent domain action overlapped directly in February of 1990, this is an appropriate juncture to shift our focus for a time to the condemnation matter. As we do so in the next section, we turn the clock back a few months, to October of 1989.

## C. The Eminent Domain Proceedings

In late October of 1989, while pursuing both prompt equitable relief and damages through the lawsuit they had filed earlier that month (No. 177104), the Blasis began taking steps that they apparently felt were necessary preconditions to the filing of a second and separate legal proceeding, a private condemnation action whose purpose would be to secure the Blasis' right to install the utilities along the disputed portion of the roadway. *See* Clerk's Trans., Vol. I, at 000202 (part of a Declaration filed Nov. 1, 1989, by Edwin Wilson).

The Blasis apparently understood that before proceeding with the eminent domain litigation they were required to secure from the Healdsburg City Council its consent to file an action to condemn the property for a public utility easement. The Blasis formally began the process of securing that consent at the meeting of the City Council on November 7, 1989, but Edwin Wilson, representing the Etchells and the Delagnes, also appeared at that meeting and persuaded the Council not to take even preliminary action on the matter until the next meeting, so that his clients could prepare a full counter-presentation. City Records, Ex. 2.

At the meeting of the City Council on November 20, 1989, the Blasis lawyer made it clear that one of the principal reasons his clients felt constrained to proceed on the eminent domain front at the same time they were pursuing an injunction in separate state court proceedings was fear that if the Superior Court declined to issue the injunction, or substantially reduced its scope, someone (presumably Robert Etchell) would tear out the utilities that the Blasis already had installed through part of the disputed roadway. City Records, Ex. 3, at 6 and 14. Concern that someone might try to rip out the utility lines that already had been installed appears

to have animated interest in this matter by some members of the City Council, as well. *Id.* at 14–15, 20–21, and 23–24.

During the same meeting of the City Council, Edwin Wilson also emphasized the relationship between the lawsuit that already had been filed and the eminent domain proceedings, but from a different perspective: he pressed the view that because the Blasis were insisting in their lawsuit that they already had a legal right to use the road for the utilities, the City Council was precluded, at least until such time as the Superior Court ruled against the Blasis, from finding the kind of "necessity" that Wilson contended California law required the Council to find before it could give the Blasis permission to file their eminent domain action in court. Thus, according to Wilson, the viability of the condemnation action turned, in the first instance, on the fate of the Blasis' pursuit of the preliminary injunction in Superior Court. *Id.* at 11–12.

After considering inputs from several sources, the City Council decided at the November 20 meeting to publicize its intent to consider the merits of the arguments about "necessity" and the other matters related to the Blasis request for permission to launch the condemnation action—after due public notice—at the Council's meeting in early December.

At the meeting of the Council on December 4, 1989, Wilson appeared again and made a substantial presentation, with documentary support. He announced that he was representing the Etchells, the Delagnes, Georgette Cadoul Etchell, and Rose Zantis (the latter claiming to have inherited ownership rights to the disputed parcel from their father, and to have quitclaimed those ownership rights to Robert Etchell in early October, 1989). City Records, Ex. 5, at 15–16. Both Robert Etchell and Gilbert Delagnes also spoke at this meeting, at some length, against the Blasis' request for permission to initiate the eminent domain proceedings. *Id.* at 41–49. Mr. Etchell claimed to own the parcel; Mr. Delagnes claimed to have a "deeded right of way" through the parcel. After receiving documents and hearing argument, the Council decided that it needed more information be-

fore deciding whether to grant permission to the Blasis to initiate their private condemnation action. *Id.* at 56–61.

This matter returned to the Council's agenda at its meeting on January 2, 1990, but, at Edwin Wilson's request, it was continued one additional time, to give him an opportunity to present a final set of documents in support of his clients' opposition to the Blasis' request. City Records, Ex. 21.

Wilson and the Blasis' lawyer appeared and made presentations to the Council at its next meeting, on January 15, 1990. Counsel for the Blasis again supported his clients' request in part by arguing that permission to initiate the condemnation action was necessary to protect the utility lines that already had been installed over part of the disputed parcel. After considering all parties' presentations, the Council voted, unanimously, to approve the Blasis' request for permission to initiate the private eminent domain action— the purpose and limit of which would be to establish the Blasis' right to run the utility lines for Bella Vista Estates through the disputed Borel Road parcel. City Records, Exhibits 22 and 23.

This decision by the Council was expressly independent of any views its members might have had about who owned the parcel in question. It did not purport to address what the other rights of the parties in the parcel might be. City Records, Ex. 5, at 4; Ex. 3, at 15–16. Nor did this decision turn at all on whether Robert Etchell or Gilbert Delagnes had acted outside his rights when, several months earlier, the two men had attempted to interfere physically with the Blasis' installation of utilities. That subject never surfaced in the several substantial discussions of the Blasis' request that the Council conducted between November of 1989 and January of 1990.

Having secured the permission of the City Council to proceed with the private condemnation action, the Blasis formally filed their "Complaint for Eminent Domain (Civil Code Section 1001)" on February 5, 1990. Clerk's Trans. Vol. III (eminent domain), at 000001.[4] The individually named defendants were Robert and Frances Etchell and Gilbert and Marianne Delagnes (the same defendants that the Blasis named in the main lawsuit).

Through the eminent domain proceeding the Blasis sought "to acquire by eminent domain an easement appurtenant to provide utility services to ... Bella Vista Estates." *Id.* at 000002. Thus, the eminent domain action had a much more limited objective than the main lawsuit: the goal of the condemnation action was simply to secure the right to install the utilities through the disputed parcel. The prayer asked for only two things: condemnation of the property to plaintiffs' use "for the purpose of an easement appurtenant to provide utility services to plaintiffs' property;" and "just compensation [for the owners, which the Blasis were not claiming to be] ... as provided by law."

Unlike their allegations in the main lawsuit, the Blasis did not assert in the eminent domain complaint that they already owned (by deed) an easement in the subject parcel. Instead, the eminent domain complaint stated that "ownership of the strip of road wherein plaintiff seeks the easement right is unknown," that there were at that time "no record owners of the said strip of property," but that the defendants (the Etchells and the Delagnes) had claimed ownership interests in the property. *Id.* at 000003. Thus, to prevail in the eminent domain action, the Blasis were not required to prove either that they owned a deed-based easement in the parcel or that the Etchells or the Delagnes had no adverse ownership or easement rights in the roadway. Nor would the lawfulness or nature of the conduct of the Etchells and the

---

4. For reasons unknown to me, the Clerk's Transcript on Appeal contains *two* volumes that are labelled "Volume III". The cover page for each of these two volumes is identical; each is identified by the same Court of Appeal Number (AO61596 D–4) and the same Superior Court Number (SCV–177104). One of these two volumes, however, contains only papers from the separate eminent domain proceeding (No.

179390). The other "Volume III" contains records from the main action, in sequence with the other four volumes of records from that action (No. 177104). I identify all of my citations to the Volume III that contains the records of the eminent domain proceeding (No. 179390) as follows: "Clerk's Trans., Vol. III (eminent domain), at ——."

Delagnes in early October, when the road was gated and blocked by a vehicle, be in issue.

Rather, under the statute on which the eminent domain action was based, California Civil Code Section 1001, the Blasis could prevail by satisfying a separate set of statutory requirements, i.e., by proving that (1) "[t]here is a great necessity for the taking," (2) that the easement would afford "the most reasonable service to the property to which it is appurtenant, consistent with the least damage to the burdened property," and (3) that the "hardship to the owner of the appurtenant property, if the taking is not permitted, clearly outweighs any hardship to the owner of the burdened property." Cal.Civ. Code sec. 1001 (as enacted in 1976).

On February 7, 1990, the Blasis deposited $100.00 with the Court in the eminent domain action, that sum representing, according to the attached written report prepared by their expert, "the probable compensation that will be awarded for the property sought to be condemned". Clerk's Trans., Vol. III (eminent domain), at 000012–13.

The next day, February 8th, the Blasis filed in the eminent domain action an "Ex Parte Application for Order For Immediate Possession" of an appurtenant utility easement, accompanied by, among other things, a "Memorandum of Points and Authorities in Support of Order for Immediate Possession". *Id.* at 000021–71. In these papers the Blasis asserted that they needed immediate possession to assure safe passage over Borel Road—which they would accomplish by completing drainage work before serious erosion damage occurred. They also alleged that the defendants had "obstructed plaintiffs' project [the installation of the utilities] and plaintiffs' roadwork", thus causing "substantial delays and financial harm to plaintiffs." The Blasis further asserted that their immediate possession for these purposes would "not displace or unreasonably affect any person in actual or lawful possession of the property to be taken." *Id.* at 000022 and 000047.

To help support their application for immediate possession, the Blasis filed several declarations that they either had earlier filed in the main action or that they were simultaneously filing in that action[5]—as part of their parallel effort (with the same objective) to persuade the court in the main action to clarify or modify the preliminary injunction. Specifically, the Blasis were asking the court in the main action to explicitly grant them permission to install curbs and gutters and to apply "chipseal" to the surface of the road. In their moving papers in the main action, the Blasis alleged that they had initiated such work on January 30, 1990, but had been interrupted when defendant Robert Etchell "threatened to rip out the curb and gutter laid down on the ground" and announced that he would "come back again and again to tear out the work completed." Clerk's Trans., Vol. II, at 000307. The Blasis further alleged that the Healdsburg police department refused to restrain Mr. Etchell until the preliminary injunction was clarified.

In those same moving papers in the main action the Blasis informed the court that the City Council of Healdsburg had consented to the Blasis "acquisition of an appurtenant utility easement" in the subject property—and that armed with that consent, the Blasis had filed a complaint in eminent domain. They went on to assert, with considerable prematurity, that: "Consequently, after the filing of the eminent domain action, the ownership and right of use dispute between the parties is moot." *Id.* at 000308.

On February 16, 1990, Judge Lloyd Von Der Mehden, sitting in Law and Motion, heard arguments from counsel for each side on the Blasis' motion to modify the preliminary injunction. *Id.* at 000340. Pursuant to an ordering continuing the hearing on this matter, counsel next appeared before Judge Von Der Mehden on February 23rd. At this juncture the judge acknowledged on the record that the Blasis had contemporaneously filed a motion in the eminent domain action

---

**5.** A fair number of papers were filed by the parties in both the eminent domain action and in the main action, some intentionally, e.g., as evidentiary exhibits in support of contentions about title or patterns of use, and some apparently by inadvertence, suggesting how closely connected in the minds of the lawyers and the staffs the two proceedings were. *See* Clerk's Trans. on Appeal, Vol. III (Eminent Domain action), at 000080–000116.

seeking "temporary" (really 'immediate') possession of the property for the same purposes that were the objects of the effort to have the preliminary injunction modified, namely, to install curbs and gutters and to seal the roadway. After hearing additional argument, Judge Von Der Mehden decided to consider both motions together at a single hearing in his Law and Motion Department on February 28th. *Id.* at 000385.

For some reason, no lawyer appeared for the Etchells and the Delagnes at the February 28th hearing. Counsel for the Blasis was present. After the hearing, Judge Von Der Mehden issued separate orders in each of the two actions (the main action and the eminent domain proceeding). He modified the preliminary injunction so that it permitted the Blasis to install the curbs and gutters and seal the roadway. *Id.* at 000387 and 000391–392. In the eminent domain action, he granted the application for immediate possession, effective 30 days from service of his order, but he limited the possession to the "specific description of alleged utility easement in roadway." Clerk's Trans., Vol. III (eminent domain), at 000117.

For reasons not clear in the record, the judge did not sign the formal "Order for Immediate Possession" that counsel for the Blasis submitted for his signature until March 29, 1990. *Id.* at 000127–128. The March 29th Order purported to articulate broader findings than are reflected in the minute order, *id.* at 000117, that was entered by the clerk on the day of the hearing. The March 29th Order indicated, erroneously, that the Court had determined "that plaintiffs are entitled to acquire this easement by eminent domain." No such finding was definitively made, as is clear from the fact that the Court later pressed the case toward trial on this issue. Apparently the judge merely concluded that the Blasis had made a showing of likelihood of success on the merits sufficient to justify entering the order— which permitted plaintiffs to take possession in thirty days for "full use of an appurtenant utility easement" in the subject property.

Meanwhile, on March 29, 1990, Edwin Wilson filed an "Answer to Complaint for Eminent Domain." *Id.* at 000119. This answer,

for reasons unknown by the undersigned, purported formally to be filed only on behalf of the Etchells. In the Answer, Wilson asserted that Robert Etchell owned the disputed parcel in fee simple and that the Delagnes claimed an ownership interest consisting of "certain easement rights of way along said property." *Id.* at 000119–120. By way of affirmative defense, the Answer asserted that "great necessity" for the condemnation could not be found—in part because the Blasis "have declared under penalty of perjury in [the main action—No. 177104] that they are already the owners of an easement appurtent ... for the purposes of installing utilities to serve their project." *Id.* at 000121. The Answer also attacked the good faith and rationality of the decision by the Healdsburg City Council consenting to the initiation by the Blasis of the eminent domain action.

It appears from the record that the parties let the eminent domain proceeding lie dormant for several months after the court issued its Order for Immediate Possession. The dormancy of the eminent domain proceeding is likely attributable to the parties' pre-occupation with the main action—which initially was set for trial in the fall of 1990. In mid-September of that year the Superior Court took the initiative to move the eminent domain action along by ordering, *sua sponte,* the parties either to file a Joint At–Issue Memorandum or appear at a status conference on November 9, 1990. *Id.* at 000136. By December 10, 1990, the Court had set the eminent domain matter for trial on April 8, 1991.

Apparently the court could not get the matter out then, so it continued the trial date until September 3, 1991. By then, the liability phase of the main action had been tried, but the court (in the person of the Honorable Gayle Guynup) had not yet issued its ruling. *Id.* at 000152. In that setting, counsel for the Blasis moved the eminent domain court to continue the trial date again. In support of that motion, the Blasis' lawyer wrote that one of the remedies the Blasis were seeking in the earlier filed matter was "Quiet Title to a right-of-way, for road and utility purposes. In both actions [counsel went on to assert],

Plaintiff is seeking the same Judicial adjudication with regard to Plaintiffs' right to install public utilities on the subject roadway. Since Plaintiff would incur substantial damages, the Eminent Domain action was filed in the event that the Court did not rule in Plaintiffs' favor in the Quiet Title action." Counsel went on to argue that the continuance should be granted because "the Court's ruling in Plaintiff's favor [in the main action] would render the Eminent Domain action unnecessary." *Id.* at 000152. Judge Raymond J. Giordano granted the Blasis' motion, continuing the trial date in the condemnation proceeding until February 24, 1992. *Id.* at 000162.

By late October of 1991 Judge Guynup had issued her ruling in the liability phase of the main action, finding (as more particularly described in the next section) that the disputed road had been impliedly dedicated for public use so that the Blasis could install their utilities. Since the damages phase of the main action was scheduled for trial in late February of 1992, and since, as counsel for the Blasis again argued, a "final ruling in Plaintiffs' favor would render the Eminent Domain action unnecessary," *id.* at 000173, the court continued the trial date in the eminent domain proceeding yet again—this time until late September of 1992. By that time, the damages phase of the main action had been tried—but the trial judge's ruling had not been issued. Again the court continued the eminent domain matter. *Id.* at 000185. After that point the developments in the main action, which remained favorable to the Blasis until the damages issues reached the Court of Appeal, essentially rendered the eminent domain action moot. It never reached trial.

## D. The Main Action from mid–1990 through mid–1995

As described in the preceding section, the Blasis succeeded in removing the principal legal obstacles that confronted their project by the spring of 1990. Over the ensuing months, they completed installation of the utilities, curbs, and gutters, and sealed the roadway. In August of 1990 they sought permission from the Healdsburg City Council to make adjustments in their development plans, some of which would affect the disputed roadway (e.g., its width, sidewalks along it, turnouts, etc.). Edwin Wilson appeared at the City Council meeting when this matter was addressed and tried, without success, to persuade the Council to reject the sidewalk proposals. Clerk's Trans., Vol. II, at 000433 and 000470. Thus, by late summer of 1990, the utilities were in place and the roadway was protected from weather-related damage. *See* Clerk's Trans., Vol. II, at 000402. On September 10, 1990, a few days after first tendering defense of the main action to Safeguard (see next section), Wilson moved for a continuance of the trial, which had been scheduled to commence on September 17, 1990. This request was based in part on the ground that Mrs. Etchell had a medical problem that would temporarily prevent her from participating. Clerk's Trans., Vol. II, at 000394. The court (in the person of Judge Sawyer) granted this motion—continuing the trial date until December. *Id.* at 000416. Subsequently, that trial date was continued as well. Clerk's Trans., Vol. III, at 000538 and 000591.

On October 1, 1990, Wilson launched an effort to have the Blasis and Philip Wright, as principal of Wright Investments, Inc., held in contempt for, allegedly, violating the terms of the preliminary injunction by installing sidewalks, retaining walls, and turnouts, removing and pruning additional trees, and failing to re-install the gate. *Id.* at 000417–421. When counsel for the Blasis filed their opposition, he emphasized, in trying to justify the actions taken by the Blasis, both the developments in the eminent domain action (especially the City's consent to the acquisition of the easement appurtenant and Judge Van Der Mehden's order permitting immediate possession) and the decisions by the Healdsburg City Council approving and/or requiring at least some of the development work that the Etchell's claimed violated the modified preliminary injunction. *Id.* at 000429–434.

With the parties' consent, the contempt proceeding was tried to Commissioner Jeanne Buckley on October 31, 1990. She ruled that the Etchells had failed to prove

the alleged contempt. *Id.* at 000503–504 and Clerk's Trans., Vol. III, at 000510.

On January 16, 1991, Wilson filed papers seeking leave to file what he called a compulsory cross-complaint. *Id.* at 000539–577. As part of his effort to justify the late filing of this pleading, Wilson insisted that it was "based on the exact set of facts and circumstances which have been the focus of this matter from the onset" and that the "causes of action ... arise directly from the same events which are the subject matter of the second amended complaint." *Id.* at 000553. With plaintiffs' stipulation, Wilson filed the "Cross Complaint for Damages, Preliminary and Permanent Injunction" on April 8, 1991. *Id.* at 000612. The cross-complainants included both the Etchells and the Delagnes.

In the first and second causes of action, both of which sounded in trespass, Wilson averred that the Etchells had had an easement in the disputed parcel at all relevant times and that they had been its owner since October 3, 1989. He also alleged that the Delagnes owned a deeded right of way (easement) through the property that entitled them to actual possession. *Id.* at 000613. The Cross Complaint recounted the construction of the gate across the roadway in early October of 1989 and the subsequent acts by the Blasis that invaded the disputed parcel (removing trees, installing utility lines, gutters, sidewalks, etc.). After purporting to state a separate cause of action for "wrongful removal of trees," this pleading went on to pray for both injunctive relief and for damages attributable to the Blasis' work on the property. *Id.* at 000612–621.

It is not clear that Wilson devoted any separate litigation activity to the cross-complaint after it was filed. The evidence and law on which the liability issues would turn on the claims in this pleading would have been, for all practical purposes, identical to the evidence and law on which the principal Blasi claims would turn. When Judge Guyn-up ruled (subsequently) in favor of the Blasis on the liability issues, she did not even mention the cross-complaint, but her findings appear to reject the claims in that pleading by necessary implication. Clerk's Trans., Vol. III, at 000678–688.

The only evidence that would have been relevant solely to the cross-complaint would have related to damages allegedly suffered by the Etchells and/or the Delagnes. Some of that evidence might have surfaced in the early equity proceedings, where the court presumably was called upon to assess the relative harm that the plaintiffs and the defendants faced. But the only litigation activity I have been able to find that appears to relate just to the damages claimed under the cross-complaint took place in September of 1990—when Michael Mahoney, an expert witness retained by the Etchells, was deposed about the value of the trees on the disputed parcel that the Etchells claimed had been cut or otherwise harmed by the Blasis. *See Etchell v. Royal Insurance,* No. C 94–1061 SBA, Settlement Brochure, prepared August 7, 1995, Vol. II, Ex. 22, at 051 (cited hereafter as "Settlement Brochure").[6]

After some remaining discovery was completed, the court bifurcated the case for trial (which was without jury); on June 18, 1991, the liability phase finally commenced before the Honorable Gayle C. Guynup. *Id.* at 000664.

In his trial brief, counsel for the Blasis recounted the history of the relevant conduct and the title disputes, but also described, as pertinent to proving the knowing wrongfulness of the defendants' conduct, the unsuccessful efforts by the Etchells and the Delagnes to persuade the Healdsburg City Council that the Blasis did not have "the legal right to extend utilities through the subject roadway." The brief proceeded to remind the court that the City had formally

---

**6.** The subsequent implicit rejection of the cross-complaint at the liability stage of the main action meant that there was no occasion to offer evidence of damages suffered by the Etchells or the Delagnes in the separate trial of the Blasis' damages claims. No judgment on the damages issues raised by the cross-complaint was ever entered because the Etchells and the Delagnes dismissed their cross-complaint sometime before October 1, 1992, when Judge Guynup filed her "Tentative Decision" on the damages issues raised by the Blasis' complaint. *See* Clerk's Trans., Vol. IV, at 000950.

agreed (through an opinion of its attorney) with the Blasis' position. *Id.* at 000642.

It also is pertinent (to the fee issues to be resolved below) that the Blasis' trial brief recounted how they felt constrained—by the defendants' claims of title and easement rights to the disputed parcel, and by the possibility that the court in the main action might find that such rights both existed and trumped the Blasis' interests in the parcel— to initiate the eminent domain proceedings in order to acquire an easement appurtenant to provide utility service. The brief went on to describe the resolution adopted by the City of Healdsburg consenting to the Blasis' acquisition of the easement and the Superior Court's Order for Immediate Possession in the condemnation action. All these matters were offered in support of the Blasis' effort to prove at trial in the main action not only that they were entitled to make the improvements that they had made, but also that the defendants (Etchells and Delagnes) acted knowingly and willfully when they interfered with those rights. *Id.* at 000647

Along with a good many other witnesses, Gilbert Delagnes testified, "on his own behalf and on behalf of the defendants," during the liability phase of the trial. *Id.* at 000675; *see also id.* at 000670.

After hearing the evidence and the arguments of counsel, Judge Guynup took the liability issues under submission on July 12, 1991. *Id.* at 000677. She issued her findings in the form of an "Order and Memorandum on Bifurcated Trial" on October 25, 1991. *Id.* at 000678–688. The first several pages of Judge Guynup's Memorandum are devoted to a detailed description of the history of title to the disputed parcel and adjoining properties. She then briefly described the defendants' conduct that blocked access to the roadway in early October, 1989, noting first that they "were on notice and had been involved in the government hearings and reviews of the project." *Id.* at 000683.

When the Court turned to the crux of its opinion it focused on whether there had been an implied dedication of the parcel to public use. En route to finding that such a dedication had been made, and that it was broad enough to permit the Blasis, with the permission of the City Council, to install the utilities and improvements in issue, the judge noted, among several other things, that the "conduct of the City of Healdsburg suggests the Municipality believe [sic] there had been an implied dedication." *Id.* at 000686. Then, with no explanation, the Court concluded that the plaintiffs had "sustained [their] burden of proving liability" on two counts: (1) intentional interference with performance of a contract and (2) "negligent interference with perspective [sic] economic advantage." *Id.* at 000688. Although the Memorandum was silent on the subject, it implied that the finding of liability ran to all four of the defendants.

This "Order and Memorandum" did not even mention the defendants' cross-complaint—but the finding of liability against them by implication constituted a rejection of their cross-claims.

After the Etchells attempted unsuccessfully to disqualify Judge Guynup, the damages phase of the litigation went to trial beginning on February 27, 1992. Clerk's Trans., Vol. IV, at 000761 et seq. In his trial brief on the damages issues, counsel for the Blasis argued that the physical interference in October of 1989 with the completion of the project, and Robert Etchell's threats in January of 1990 to rip out additional planned improvements, played key causal roles in the damages picture. Clerk's Trans., Vol. III, at 000730–731. The Blasis' brief also contended that it was "due to Defendant Robert Etchell's interruption of the project and threats to rip out the curb and gutter laid down on the ground" that plaintiffs both sought modification of the preliminary injunction in the main action and filed the separate complaint in eminent domain, promptly seeking in that proceeding the order for immediate possession. *Id.*

In support of their claim for punitive damages, the Blasis' brief cited, as evidence of willfulness and conscious disregard of the rights of others, the history of the Etchells' and the Delagnes' efforts to block the development by lobbying Healdsburg public officials and pressing arguments before the City Council—before and after the Blasis felt constrained to initiate the lawsuit. *Id.* at

000732–733. Arguing in a subsequent section of the brief for sanctions, the Blasis contended that evidence that the defendants had abused the judicial process could be found in the fact that before "the commencement of this litigation, Defendants engaged in legal tactics calculated to force Plaintiff [sic] into litigation" (alluding, apparently, to the defendants' efforts to block the project through local political channels and by having Mr. Wilson, their counsel, write threatening letters to the developers). *Id.* at 000758.

Trial of the damages issues proceeded sporadically, as the participants' schedules permitted, between late February and June 26, 1992, when counsel concluded their final arguments. Clerk's Trans., Vol. IV, at 000788.

In July the Blasis pressed elaborate motions for sanctions, on numerous grounds, including a charge that the eleventh hour effort to disqualify the trial judge had been undertaken in bad faith. One modest part of the defendants' opposition to these motions was a Declaration filed by Marianne Delagnes, who recounted how her son had given her apparently reliable information about a connection between the judge's husband and one of the plaintiffs. *Id.* at 000916. I infer that Mr. Wilson, who continued to represent the Delagnes, and under whose auspices this Declaration was filed, helped Mrs. Delagnes draft it.

On August 6, 1992, the Court denied the Blasis' motion for sanctions in its entirety. *Id.* at 000939–940.

Judge Guynup filed a "Tentative Decision" in the main action on October 1, 1992. She spent the first several pages of this decision reviewing and to some extent elaborating the bases for liability that she had articulated in her "Order and Memorandum on Bifurcated Trial" on October 25, 1991. On this occasion, she offered conclusory statements as to why, in her view, each of the four defendants was liable for both of the charged torts: intentional interference with performance of a contract and negligent interference with prospective economic advantage. Starting with Frances Etchell, the Judge noted that evidence about her regular attendance at the public meetings and site conferences, as well as about her "vigorous protection of the heritage trees and her active watchdogging of the project" was "relevant only as it established her knowledge of the progression of the development and her knowledge of the specific plans, including the installation of utilities and improving of Borel Road." *Id.* at 000945–946.

The entirety of the Court's statement of the additional bases for liability consisted of the following three sentences:

Robert Etchell and Gil Delagnes jointly blocked the roadway on the first occasion. Mrs. Delagnes claimed ownership of the roadway and in Mrs. Etchell's company requested the Assessor to assign a parcel number in her husband's name, at her husband's request. When Robert Etchell met with Georgette Etchell to obtain a quitclaim deed of the properties [sic] right of way, he told her of his problems with the development and his conclusion that utilities were not included in the right of way. *Id.* at 000946.

Judge Guynup devoted the remainder of her "Tentative Decision" to the damages issues, finding defendants liable for substantial amounts, but not specifying the total award. Along the way, she explicitly found that the Blasis had not proved that any of the defendants had acted with the malice or oppression necessary to support a punitive damages award—even though their conduct was intentional. In her brief comments about the punitive damages issues she noted that "the defendants [apparently all of them] had the expert opinion of Joan Woodruff before the blockades were erected," that arrangements had been made to purchase the right of way (apparently referring to the Etchells), and that "Mr. Delagnes had treated the right of way as his own for over thirty years." *Id.* at 000949.

On March 2, 1993, after receiving a lengthy proposal from counsel for plaintiff and substantial objections from defendants, Judge Guynup filed her final "Statement of Decision" in this litigation. Clerk's Trans., Vol. V, at 001017–001029. Again the Judge announced that Robert Etchell was not the owner of the disputed parcel because it "was dedicated to the public." *Id.* at 001018. She

also found that the Etchells' had no private easement rights in the parcel. Judge Guynup did conclude that the Delagnes had private easement rights for purposes of ingress and egress, but that they had no interest adverse to plaintiffs' rights. *Id.* at 001020. She further found that plaintiffs' had a deed-based easement over the full length of the disputed roadway. *Id.* at 001021.

The Judge's recitation of the factual bases for the findings of liability largely tracked her earlier liability order and her tentative decision (that defendants had full knowledge of the planned development, tried to claim ownership interests in the disputed parcel, physically blocked the installation of utilities, etc.), but in this final statement she clarified one point that she had made only obliquely before: "Mr. Etchell contacted, persuaded and advised Rose Zantis and Georgette Etchell to quitclaim their interests in order to prevent the completion of the road work and installation of utilities." *Id.* at 001023. Judge Guynup drew no clear lines between the factual bases for her finding that the defendants were liable on the cause of action for intentional interference with contract and the bases for her finding that they also were liable on the cause of action for negligent interference with plaintiffs' economic advantage. The bases for liability on these two causes of action seemed essentially identical.

On the same day (March 2, 1993) that she filed her "Statement of Decision," Judge Guynup also filed a "Judgment Quieting Title" that had been prepared by counsel for plaintiffs. *Id.* at 001031–034. It essentially repeated findings in the earlier statements of decision: the parcel had been publicly dedicated, plaintiffs owned an easement in it, and defendants had no interests in it that were adverse to plaintiffs. This judgment formally confirmed plaintiffs' easement rights and quieted title in those rights against all future claims by the named defendants—but it went on to do much more than quiet title. It awarded "actual damages" of $154,043.62—plus prejudgment interest on that sum as well as on an additional $97,250.00 (the principal that the joint venture owed to Al Blasi individually). Each of the four named defendants was deemed liable for these sums.

The judgment also permanently enjoined all four defendants from "interfering with or obstructing the Plaintiffs' or the public's easement rights" as described earlier in the judgment.

In April of 1993 Edwin Wilson filed extensive papers in support of a motion for a new trial (in part based on newly discovered evidence) and a Notice of Appeal. *Id.* at 001070–001151 (the last cited page is the Notice of Appeal). I infer that the motion for a new trial was denied (no new trial was held). The appeal was made on behalf of all four of the defendants, Mr. and Mrs. Etchell and Mr. and Mrs. Delagnes.

In May and June of 1993 undertakings (original and amended) were filed for the purpose of staying enforcement of the judgment pending appeal. *See* second to last exhibit (not numbered) in the Etchells' "Response to October 30, 1995 Order Re Evidentiary Hearing," in separate spiral binding, received November 3, 1995. It is noteworthy that these undertakings were filed on behalf of only Robert and Frances Etchell, not on behalf of the Delagnes. According to the Etchells' attorney, the Blasis did not object to the undertaking being so limited.

The proceedings before the Court of Appeal were not concluded until April 10, 1995, when the panel filed its opinion (which it declared should not be published in the official reports). *Id.* at last exhibit. The appellate court affirmed the trial court's rulings on the principal liability issues, but reversed the award of damages. More specifically, the panel held that there was substantial evidence to support Judge Guynup's findings that the disputed parcel had been impliedly dedicated to the public, that the implied dedication had been accepted, and that the reach of that dedication was sufficient to include all the improvements the Blasis had made (with the permission of the City). The appellate court further found that there was substantial evidence to support the trial court's finding that the Etchells' owned no interest in the parcel and that the easement interest owned by the Delagnes was not adverse to the City's and the Blasis' interests. Thus the appellate court affirmed the decision to quiet title in the City and the Blasis and to enjoin

the Etchells and the Delagnes from interfering with their uses under that title.

In affirming the trial court's equitable decree, the Court of Appeal specifically pointed to that decree's dependence on the resolution of the quiet title issues: "Because the portion of the judgment enjoining appellants from engaging in certain acts flows from the court's decision about title to and rights in Borel Road, that portion is affirmed, as well." *Id.* at 10–11.

The trial court's award of damages against the Etchells and the Delagnes was reversed because the appellate court concluded that there was no evidence to support a finding that unprivileged conduct engaged in by any of the defendants caused more than *de minimis* delays (six days, at most) in completion of the Blasis' project. En route to this conclusion, the Court of Appeal noted that the defendants' participation in the lawsuit was privileged, as was "the Delagnes's act of securing an assessor's parcel number in Gilbert Delagnes's name," an act that the appellate court said "occurred shortly after the instant action was filed and was clearly undertaken in furtherance of their goals in this litigation." *Id.* at 10. Interestingly, the Court characterized the Etchells' and the Delagnes' participation in the lawsuit as "principally, defending themselves against respondents' claims and asserting that they had certain rights in the roadway parcel." *Id.* at 9.

After the Court of Appeal issued its decision, counsel for the Etchells and the Delagnes conducted some research in order to be prepared to address the issues between the parties if a petition for rehearing was filed or if the appellate court's decision was taken to the California Supreme Court. Apparently no petition for rehearing was filed, and the appellate court's remittitur issued on June 16, 1995.[7] No party elected to take the matter to the California Supreme Court.

### E. The Tenders and Safeguard's Responses

Even though the Blasis filed the main action against the Etchells on October 5, 1989,

Wilson made no tender on their behalf until early September of 1990, when trial of the liability phase of the main action scheduled to commence within two weeks (on September 17, 1990). When asked during the hearing before me why he had not tendered this matter earlier to Safeguard, Wilson indicated only that he had been too busy and distracted with the two legal proceedings.

The Etchells' tender took the form of a letter, over Wilson's signature, dated September 4, 1990. The tender letter to Safeguard mentioned only the main litigation, No. 177104; it did not mention or formally purport to tender the eminent domain action, which had been on file for seven months and in the works for at least ten.

Wilson attached to the tender letter a copy of the Blasis' Second Amended Complaint in the main action, and stated that because the case was scheduled to go to trial on September 17 "it is important that immediate action be taken on this Complaint by Safeguard Insurance Company." Plaintiffs' Ex. 26 for the October 27, 1995, evidentiary hearing (unless otherwise indicated, references hereafter to "Plaintiffs' Exhibits" are to the exhibits as numbered for this evidentiary hearing).

Safeguard received both Mr. Wilson's September 4 tender letter and a broker's loss notice within a few days; a "Supervisor's Comments" memo, dated September 11, 1990, indicates that the Safeguard adjuster and his supervisor were aware of the tender but had serious questions about whether there was coverage. *See* document numbered C 0000035 in Safeguard's Claims File on the Blasi litigation, with allegedly privileged matters redacted or withheld, as produced to Edwin Wilson on August 7, 1995, and as presented to me on November 6, 1995, as the bulk of Ex. A to the Declaration of Jennifer M. Hutcheson, executed Nov. 3, 1995 (cited hereafter simply as "Claims File").

What happened to the processing of this claim within Safeguard over the next two months is not clear; there is some evidence

---

7. I rely for the statement about when the remittitur issued on an uncontested assertion of this

fact in "Plaintiff's [sic] Closing Brief Re Fees," filed October 12, 1995 in this court, at p. 18.

that an adjuster tried to reach Mr. Wilson by phone on November 9, 1990, without success, and then tried again on November 13th, again without success. Claims File, at C 0000038. On November 15, 1990, Safeguard's Bob Lochead acknowledged in an internal memorandum that the Company had not been able to reach Mr. Wilson, but had decided to "deny defense and indemnity if demand is still being made." *Id.* at C 0000039. Mr. Lochead's supervisor appears to have instructed him on the same day to draft a letter to the Etchells and their attorney "preliminarily denying coverage but asking for any additional facts we might want to consider." *Id.*

Again there is a gap in the claims file, which reflects no action on this matter for an additional two months. On January 15, 1991, Mr. Lochead dictated the letter to Mr. Wilson that was contemplated in the November 15, 1990 instruction. *Id.* at C 0000040. Mr. Lochead's letter, which is dated January 17, 1991, stated that, based on "the information at hand, there would not appear to be any obligation on Royal [Safeguard] to either defend or indemnify the insured in this matter. Before making a final determination, however, I would like to discuss the case with you and perhaps gather further information." Mr. Lochead went on to claim to have called Mr. Wilson "several times and left messages," without receiving a response. He closed by asking Wilson to "call at your convenience." *Id.* at C 0000043. Mr. Lochead's letter did not specify any specific ground for the Company's initial conclusion that the policy provided no coverage.

It is not clear that Wilson responded to Lochead's request for a phone call. It appears that months passed before any effort to communicate was made by either the Etchell's lawyer or the carrier. In July a claims representative (Jane Butterfield) dictated a declination letter, which focused on the fact that the accused acts were intentional, but this letter was not sent. *Id.* at C 0000054–58.

In August of 1991 a representative of the carrier called Wilson's office, but he was on vacation, so she was able to speak only with his secretary. In that conversation Safeguard's representative told Wilson's secretary that, "based on what I have denial is in order, however, I do not wish to proceed w/ that until I have heard Etchell's side of the story." *Id.* at C 0000064. The claims representative's notes from this conversation (as well as the page of the Claims File that precedes those notes) clearly indicate that the carrier knew at least by August 12, 1991 about the condemnation action. The notes indicate that Wilson's secretary told the carrier's representative that the condemnation case was set to go to trial in less than a month, on September 3, 1991. *Id.*

Surprisingly, another period of non-communication between carrier and insured ensued. On November 5, 1991, Mike Collins of Safeguard instructed Jane Butterfield to "get the denial letter out and invite any comments if the insured disagrees," but no such letter was sent. *Id.* at C 0000066. Between July and September of 1992 the carrier apparently re-discovered the dormancy of this claims file and decided, without telling Wilson or the Etchells, that it was too late to take any action on the matter and that the safest course (i.e., the course least likely to "stir up trouble" for Safeguard), was simply to close the file. *Id.* at C 0000065–67 and 00000099.

The next communication from the carrier did not occur until May 3, 1993, when Safeguard again denied coverage, this time after receiving another tender from Wilson, dated April 5, 1993. *Id.* at C 0000115–116 and 0000117–118. Again Wilson's tender on behalf of the Etchell's focused exclusively on the main action (for damages and injunctive relief, No. 177104); again his tender letter did not mention the condemnation proceeding.

Wilson never formally tendered the condemnation action.

Safeguard's denial letter of May 3, 1993 (written by outside counsel) emphasized that coverage could not extend to willful acts and that the alleged obstruction of the roadway by the Etchells did "not constitute wrongful eviction or wrongful entry" as those terms were used in the extended coverage endorsement. *Id.* at 0000118.

The next and final document in the claims file is Wilson's letter to counsel for Safeguard, dated March 2, 1994, enclosing a copy of the bad faith Complaint that initiated the case at bar. *Id.* at C 000120 et seq.

## II. JUDGE ARMSTRONG'S RULING ON THE DUTY TO DEFEND

In granting the Etchell's motion for summary judgment, Judge Armstrong relied on specific provisions in the insurance policy that extended coverage by amending the definition of "bodily injury" to include coverage, even for intentional acts that did not involve an "occurrence" (as that term was restrictively defined for other policy purposes), to injury "arising out of . . . invasion of privacy, wrongful eviction or wrongful entry." Order Granting Motion for Summary Judgment, Filed June 20, 1995, at 4 (cited hereafter as "Summary Judgment").

En route to holding, as a matter of law, that this policy language imposed a duty to defend on Safeguard, based on the allegations in the Blasis' Second Amended Complaint, Judge Armstrong emphasized that under controlling California law, coverage in these kinds of situations is "triggered by the insured's commission of the intentional tort, not the injury or damage suffered by the plaintiffs in the *Blasi* action." *Id.* n. 3, at p. 4.

Drawing in part on authorities from other jurisdictions, Judge Armstrong concluded that the phrases "wrongful eviction" and "wrongful entry," as used in the Etchells' policy, were defined so as to reach allegations of actual interference with a complainant's alleged possessory rights in real property. *Id.* at 15. Noting that the Second Amended Complaint accused the Etchells of interfering with the Blasis' easement rights in Borel Road, and that an easement "is real property," Judge Armstrong had no difficulty concluding that the underlying lawsuit included "allegations of interference with possessory rights to real property." *Id.* at 16. The key factual allegations on which the District Court focused in reaching this conclusion were "erecting a fence across Borel Road and parking cars along the road." *Id.* These were the key alleged wrongs that trig-

gered the duty to defend—independent of when, or to what extent, these wrongs caused injury to the Blasis.

The Etchells contend that Judge Armstrong's "Order Granting Plaintiffs' Motion for Summary Judgment" resolves in their favor one of the arguments on the basis of which Safeguard now challenges the fee petition. Specifically, the Etchells suggest that Judge Armstrong's Order forecloses Safeguard's argument that some of the Blasis' causes of action were so separable from the claims that triggered the duty to defend that Safeguard is not obligated to pay for the defense of those distinct causes of action. While, as explained below, I agree that Safeguard is not entitled to reduce the Etchells' fee on this ground, it is not clear to me that Judge Armstrong's Order was intended to take this argument off the table. While that Order three times refers in substance to the duty to defend as applying to "the *Blasi* action" (*Id.* at 13 and 16, including note 5 on p. 16), Judge Armstrong never purported to squarely address this particular argument by Safeguard about the *extent* of its fee obligation. I believe that if Judge Armstrong had intended to foreclose this line of argument by Safeguard, she would have addressed it directly in her Order and would have clearly delimited her order of reference to me. Since she did neither, I infer that her allusions to the duty to defend "the *Blasi* action" were intended to mean only that that litigation triggered a duty to defend, the exact boundaries of which she left to be fixed on another occasion.

## III. THE ETCHELLS' ADJUSTED CLAIM AND THE REASONABLENESS OF THE HOURLY RATES

### A. The Size of the Adjusted Claim

The Etchells contend that they are entitled to reimbursement from Safeguard for all of the fees and costs that they incurred in all stages and all facets of both the main action and the condemnation proceeding. When first presented, the Etchells' claim for these fees and costs totalled $237,822.92 ($45,566.69 of that sum consisting of prejudgment interest). *See* Etchell Settlement Brochure, Vol.

I, Ex. 1 at 001 (dated August 7, 1995). At the hearing before me on October 27, 1995, however, the Etchells withdrew one portion of their claim: the $10,413.25 that they attributed to paralegal fees, all of which apparently were based on hours committed to these matters by Frances Etchell. *Id.* at Ex. 19. Thus, as adjusted after the hearing, the Etchells' claim here is for $227,409.67. It is against that sum that any deductions based on the challenges by Safeguard would be made.

## B. The Reasonableness of the Hourly Rates

■ Safeguard correctly points out that the Etchells (and Mr. Wilson) bear the burden of proving that the hourly rates on which the fee claims are based were reasonable [8]— given the character and complexity of the litigation, Edwin Wilson's experience and other qualifications, and the locale in which the legal services were performed.

■ The rates at which Wilson charged the Etchells were: $130 per hour between 1989 and June 1, 1992, $150 per·hour from June 1, 1992 through mid-March of 1993, and $165 per hour from March 17, 1993 through the present. Settlement Brochure, Vol. II, Ex. 22, especially at 114 and 142.

As the account of the underlying proceedings in the earlier sections of this Report makes clear, the litigation under review here was both legally and factually complicated. The conduct that gave rise most immediately to the action was straightforward: Robert Etchell's blocking of the roadway by re-installing the gate and parking the vehicle behind it. But it was not that conduct on which the underlying case turned. Rather, what dominated the case was a hotly contested exploration of competing chains of title (both with deep historical roots) and of mutually exclusive contentions about patterns of use, over a substantial period of time, of the contested roadway. The parties also devoted considerable litigation energy to generating evidence about proceedings before public bodies in the City of Healdsburg—and about the roles in those proceedings that had been played by both the plaintiffs and the defendants.

The judge to whom these matters were first presented (in the fall and early winter of 1989) concluded that they were too complicated to be resolved in the equity proceedings that were litigated in the first few months after filing. Two years later, after the matter finally reached trial on the liability issues, it was months before Judge Guynup could issue her tentative decision. The parties and the court devoted many additional trial days, another year later, to the damages issues. As we have seen, the damages claims were elaborate, large, and infected with difficult causation issues. Again it was months before Judge Guynup issued her ruling.

It also is relevant (to determining whether the hourly rates were reasonable) that intense and hostile emotions plagued these proceedings from the outset—adding another layer of stress and difficulty to the lawyering.

Through his testimony at the October 27, 1995, hearing before me Edwin Wilson established that he has strong qualifications for the work he performed in this case. He earned an undergraduate degree in forestry in 1963. In 1972 he graduated in the top 10% of his class from the law school at the University of California at Davis. For the next two years he served as a law clerk to United States District Judge Thomas J. McBride, then entered the private practice in the Healdsburg/Santa Rosa area in which he has been engaged since. About 70% of his practice over the past 20 years has been devoted to real estate litigation. He has tried approximately 100 civil cases.

Wilson testified that he actually billed the Etchells at the hourly rates reflected in his billing statements—and that he charged other clients those same rates during the same periods. He also stated that in the Healdsburg–Santa Rosa area he has been successful

---

8. Safeguard has not pressed or attempted to support an argument that the amounts of time that counsel for the Etchells billed for tasks undertaken in the underlying litigation were excessive. Thus Safeguard has waived any challenge to the fees based solely on the number of hours committed to any particular component of the defense.

in both attracting more work than he could handle at these rates and in collecting his fees. He reported some familiarity with rates charged by other lawyers in his region—and that a consultant knowledgeable about these matters has helped him set his rates to conform to local market conditions.

Wilson further testified that the Blasi litigation consumed huge percentages of his time during some periods, but that over the six year life of these disputes he probably devoted only about 10% of his time to them.

To bolster his own testimony about the reasonableness of the hourly rates he charged in this case Mr. Wilson called as a witness Hans William Herb. Mr. Herb is a 1988 graduate of Hastings College of the Law. He worked in insurance defense in San Francisco until 1990, when he moved to Sonoma County, where he has practiced since. He has done considerable work since 1990 related to fee disputes in matters involving insurance carriers. Mr. Herb claimed, without contradiction, to be familiar with hourly rates charged in Sonoma County (which includes Santa Rosa and Healdsburg). He reported that the hourly rates vary with the complexity and character of the litigation, with personal injury cases arising out of automobile accidents commanding lower fees than more demanding business litigation. He testified that he currently charges $175 an hour, and that the target rates charged by other lawyers in Sonoma County for defending complicated cases ranges between $150 and $175 per hour. In general, Mr. Herb's testimony supported Mr. Wilson's claim that the hourly rates at which he charged the Etchells in these proceedings were reasonable.

Safeguard's attack on the Etchells' evidence about the reasonableness of Wilson's hourly rates was limited to testimony by Susan Carbone.[9] Ms. Carbone has been a lawyer in San Francisco for 20 years, working primarily in insurance defense. She testified that between 1990 and mid–1993 Safeguard generally paid lawyers in the Bay Area at the rate of $100 per hour for general liability defense work and $125 per hour for coverage work. She further testified that in mid–1993 Safeguard increased these rates to $110 per hour for liability defense work and $135 per hour for coverage work. According to Ms. Carbone, there have been no increases in these rates since mid–1993. Ms. Carbone did not claim ever to have practiced out of Sonoma County, or to have conducted an investigation into hourly rates customarily charged by individually retained lawyers in that county. Thus Safeguard presented no evidence that focused directly on billing practices in Sonoma County.

Based on the evidence described in the preceding paragraphs, I conclude that the Etchells have met their burden of proving that the hourly rates billed to this matter by Mr. Wilson have been reasonable throughout the period in question. Safeguard's challenge is not sufficient to overcome the inferences that are firmly supported by the authentic billing records and the testimony of Mr. Wilson and Mr. Herb. Safeguard has not suggested that Mr. Wilson did not in fact bill the Etchells at the claimed rates—or that the rates were inflated in anticipation of coverage. Nor would any such suggestion be persuasive, especially given the fact that Mr. Wilson appears to have been billing the Etchells (at the $130 per hour rate) for a year or so before realizing that he could tender the defense of the main action to the Etchells' carrier.

Moreover, Ms. Carbone's testimony about hourly rates that Safeguard paid to lawyers defending its insureds is only marginally probative on the issue under consideration here. As Wilson points out, the issue is not what a large institutional litigant that can offer work to lawyers in volume and over considerable periods could get away with paying in the Bay Area, but what individually retained attorneys like Mr. Wilson customarily charged private clients for work of this character in Sonoma County. Ms. Carbone failed to make it clear, in other words, that there was

9. Safeguard also offered the Declaration of John Edwards, one of its claims managers, but since Mr. Edwards was not present to testify and since the same information that was proffered through his Declaration was introduced through Ms. Carbone's testimony, I decided not to admit Mr. Edwards' Declaration into evidence.

a sufficient parallel between the market circumstances giving rise to the rates she described and the market circumstances faced by the Etchells. She did not discuss, for example, the obvious possibility that the rates she described were affected by promises or expectations that the lawyers would get additional business, or the possibility that those rates were products of essentially bulk-rate contracts.

## IV. SAFEGUARD'S CHALLENGES TO CLAIMED FEES AND COSTS

### A. Pre-tender Expenses

■ The parties' dispute about whether pre-tender fees and costs are recoverable under the specific circumstances presented in this case implicates at least four different lines of California authorities—lines of authorities that appear, at least on the surface, to be in tension and that no reported opinion from either a California or a federal court has explicitly attempted to reconcile. Unarmed by massive confidence, I have attempted to make the necessary reconciliation. The reconciliation that I propose, as explained below, results in my recommendation that the District Court DENY the claim for pre-tender fees and costs.

I begin by sketching the arguably pertinent doctrinal landscape—describing in summary fashion the different lines of authority which, according to one or the other of the parties, are relevant to disposition of this part of their dispute. I then undertake a more detailed consideration of the cases and legislation—and explain why I recommend that the District Court choose the particular course I have selected.

Safeguard relies on a line of cases that begins with *Gribaldo, Jacobs, Jones and Associates v. Agrippina Versicherunges A.G.*, 3 Cal.3d 434, 91 Cal.Rptr. 6, 476 P.2d 406 (1970) and concludes with a recent opinion from the Court of Appeals for the Ninth Circuit, *Faust v. The Travelers*, 55 F.3d 471 (9th Cir.1995). This line of cases enforces clauses, similar or identical to section 3(e) of the Conditions provisions in the policy in the case at bar, that prohibit an insured from voluntarily incurring expenses or obligations related to claims without the prior consent of the carrier.[10] It is arguably significant that in all of the cases in this line the carrier did not rigidly deny having any obligations under the subject insurance policies and did agree to provide a defense (generally under a reservation of rights).

The authorities that arguably cut in the opposite direction, to some of which the Etchells point in support of their claim for pre-tender fees and costs, include: (1) section 554 of the California Insurance Code, which declares that a carrier waives an insured's delay in providing notice or proof of loss if the carrier fails to object promptly and specifically on that ground; (2) a line of California cases under which carriers have been held to have waived defects in notice or proof of loss when they deny coverage, *see, e.g., Comunale v. Traders & General Ins. Co.*, 116 Cal. App.2d 198, 202–203, 253 P.2d 495 (Second Dist.1953); and (3) another line of California cases that prohibit carriers that are defending against third party claims from using a failure by their insured to comply with notice or cooperation clauses to escape liability unless the carriers can show prejudice caused by the failure, *see, e.g., Campbell v. Allstate Ins. Co.*, 60 Cal.2d 303, 32 Cal.Rptr. 827, 384 P.2d 155 (1963).

### 1. The *Gribaldo—Faust* Line of Authority

Having thus outlined the legal environment, we turn to a more detailed consideration of the authorities. We begin with what appears to be controlling authority from the federal Court of Appeal by which we are governed (the Ninth Circuit) and from the California Supreme Court. As recently as May of 1995, the 9th Circuit agreed to enforce a clause prohibiting voluntary payments that is virtually identical to the clause in issue here. In *Faust v. The Travelers, supra*, a panel of Ninth Circuit judges assert-

---

**10.** The Conditions in the Etchells' policy include sub-section 3(e), which states: "The insured will not, except at the insured's own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the bodily injury." Quoted at p. 6 of Safeguard's Opposition to Plaintiff's Memorandum Re Fees, filed September 28, 1995.

ed that "California courts have consistently honored voluntary payment provisions". *Id.* at 472.

In support of this assertion, the *Faust* court cited an earlier 9th Circuit opinion, *Northern Ins. Co. of New York v. Allied Mutual Ins. Co.*, 955 F.2d 1353, 1360 (9th Cir.1992), cert. denied, 505 U.S. 1221, 112 S.Ct. 3033, 120 L.Ed.2d 903 (1992), which, in turn, cited (in support of this characterization of California law) only one case, *Gribaldo, supra.* But *Gribaldo* is an important decision by the California Supreme Court that has not been criticized in a majority opinion from that Court since it was filed in 1970.

The pertinent portions of *Gribaldo* are dicta [11]—but are substantial and explicit. Federal courts may not assume that these obviously studied pronouncements (which have not subsequently been disturbed) do not represent an authoritative statement of what California law is.

The "Condition" in the insurance policy that was in issue in *Gribaldo* was worded differently than the Condition in issue in the case at bar, but seems to have had the same purpose and effect. The Condition in the *Gribaldo* policy prohibited the insured from admitting any liability, settling any claim, or incurring any expenses or costs in connection with a claim "without the written consent of the Underwriters, who shall be entitled at any time to take over and conduct in the name of the Assured the defense of any claim." *Id.* at 441, 91 Cal.Rptr. 6, 476 P.2d 406. Noting that clauses like this are "common in liability insurance policies," and that their purposes are to prevent collusion and to "invest the insurer with complete control and direction of the defense or compromise of suits or claims," *Id.* at 449, 91 Cal.Rptr. 6, 476 P.2d 406, the State Supreme Court went on to declare that

> "it is only when the insured has requested and been denied a defense by the insurer that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that

refusal undertake his own defense at the insurer's expense." *Id.*

Because the insureds in *Gribaldo* had never made a demand that the carriers undertake the defense or give their permission for the insureds to incur the expense of so doing, the State Supreme Court concluded that the insureds had voluntarily incurred the defense costs that were in issue and thus that they were precluded, under the cited Condition of the policy, from recovering those costs from their carriers.

Elaborating this ruling, the Court emphasized the importance of the requirement that the insureds make the demand of the carriers: the making of such a demand would put the carriers to a choice (either provide the defense or be stuck with paying for the defense which the insureds arranged)—and would create the opportunity that was necessary to achieve the ends of the pertinent clause. "Having failed to make such a demand and thereby put defendants to a choice, plaintiffs should not be entitled to recover defense costs voluntarily incurred by them." *Id.* at 450, 91 Cal.Rptr. 6, 476 P.2d 406.

The Etchells would argue that it is the fact that the insureds *never* made a demand, so that the carrier in that case never had occasion to deny coverage during the pendency of the underlying litigation—that crucially distinguishes *Gribaldo* from the case at bar and makes its dictum irrelevant here. I will consider whether the absence of a denial of coverage makes such a crucial analytical difference when I examine the waiver authorities, below.

Before discussing the waiver authorities, however, we must examine in greater detail the 9th Circuit's 1995 opinion in *Faust, supra.* The underlying situation in *Faust* is distinguishable from the case at bar in two ways: (1) there were two lawsuits against Faust, the second filed only after the first was dismissed, and (2) when tender was first made, after the second suit was filed, the carrier agreed to provide a defense under a reservation of rights. We will consider the

---

11. The Court already had ruled that the carrier had no duty to defend—based on interpretation of substantive provisions of the policy in issue.

significance of the second basis for distinguishing the cases when we discuss the waiver cases, below.

It is not clear that any analytical significance attaches to the first basis for distinguishing the cases. The fact that the first suit was filed, at least nominally prosecuted for about three months, then dismissed without the insured tendering defense of the matter, makes the claim for fees incurred during that first action (it was that claim that was in issue in the only pertinent part of the *Faust* opinion) parallel in important respects to the situation the *Gribaldo* Court perceived itself as facing. Relying on *Gribaldo*, the Ninth Circuit began its analysis in *Faust* of whether the defense expenses incurred in the first action were recoverable despite policy language prohibiting the insureds from voluntarily incurring such expenses (without first securing the consent of the carrier) by asserting that "California courts have consistently honored voluntary payment provisions" like the one in Faust's policy.

Significantly, the appellate panel went on to reject an argument by Faust that such clauses were enforceable under California law only if the carrier could prove that it had been prejudiced by the insured's failure to tender promptly. The 9th Circuit distinguished the cases that had imposed such a prejudice requirement, cases that included *Campbell, supra,* and *Clemmer v. Hartford Ins. Co.,* 22 Cal.3d 865, 151 Cal.Rptr. 285, 587 P.2d 1098 (1978), by pointing out that in those cases the carrier had tried to use an alleged failure by the insured to comply with a notice or cooperation condition to escape *all* liability under the policy. In *Faust*, by contrast, the carrier had not tried to use the insured's failure to tender as an excuse to avoid all liability under the policy.

Instead, the carrier had used the failure to tender in the first suit only to justify its contention that it was not liable for the expenses incurred in that pre-tender litigation, i.e., only to justify its refusal to pay expenses incurred before any tender at all. The carrier had agreed to provide a defense (under a reservation of rights) in the second suit, promptly after tender was made—and was not trying to escape liability in that action

simply because no tender had been made in the first suit. According to the Ninth Circuit panel, this difference was crucial. In essence, the panel ruled that analysis of rights under the voluntary payment provision can and should proceed separately from analysis of rights under the substantive provisions of the insurance policy, and that a carrier had every right to limit the extent of its exposure to defense expenses by enforcing the voluntary payment provision as long as the carrier limited the use of that clause to that purpose—and did not try to use the clause to escape all liability (for post-tender defense costs and for indemnity) under the policy. Thus, the Court held that the voluntary payment provision could be enforced separately if enforcement was limited to the reach and purpose of that provision.

Consistent with *Faust's* reading of *Gribaldo*, Safeguard contends in the proceedings before us that it is invoking the prohibition against incurring expenses without consent only for the purpose of limiting its exposure to fees and costs incurred before the Etchells made the tender, not to try to avoid all other liability under its policy. It would appear that this court is bound by the reasoning and rulings in *Faust* and *Gribaldo* unless the fact that Safeguard, unlike Faust's carrier, denied all coverage when the Etchell's finally made their tender is sufficient to force analysis into a different doctrinal channel—controlled by different authorities.

Before turning to the other possible analytical channels, we pause briefly to consider whether the California Court of Appeal decision in *Fiorito v. Superior Court,* 226 Cal. App.3d 433, 277 Cal.Rptr. 27 (Fourth Dist. 1990) compels a different outcome. We consider *Fiorito* because it involves an effort by a carrier to avoid pre-tender defense costs by seeking to enforce a voluntary payment provision like the one in issue in the case at bar. The *Fiorito* court refused to read *Gribaldo* as completely foreclosing the possibility, as a matter of law, that an insured could ever collect pre-tender fees. Instead, the California Court of Appeal held that, at least in some settings, an insured should be permitted to try to prove that, essentially as a matter of fact, the pre-tender payments it

made were not "voluntary" as that phrase is used in these clauses. Pre-tender expenses might be involuntarily incurred (i.e., without consent but still without violating the prohibition on voluntarily incurring expenses), according to the *Fiorito* panel, if an insured could show that despite its reasonable efforts to ascertain its rights under its policies and to tender the defense, the insured was compelled (e.g., by threat of imminent loss of rights, default, etc.) to act before tender could reasonably be made, or before the carrier could be expected to respond to a request for consent.

Given its status as an intermediate court of appeal, and given the undisturbed presence of *Gribaldo,* the *Fiorito* court did not declare—and could not have declared—that carriers could not enforce voluntary payment prohibitions of the kind in issue in the case at bar. Thus *Fiorito* has no effect on the character of the law as articulated in *Gribaldo* and in *Faust. Fiorito* would be relevant to the matter pending before us only if the Etchells had contended that they had incurred their pre-tender expenses "involuntarily". But the Etchells have made no such contention. Nor is it clear that they could, plausibly. It was almost a full year between the time they were served with the first complaint filed by the Blasis and the time they tendered to Safeguard. There is no reason to believe that during that period they were too busy to make a tender, or that they were disabled from locating the pertinent insurance policy. They have not claimed that during that year they did not know that they had possible rights under the subject policy—or that any other circumstance beyond their control prevented them from tendering sooner than they did. Given the record in this matter, we see no basis for a finding that any pre-tender expenses were involuntarily incurred—so *Fiorito* is irrelevant.

We turn now to consider whether there might be differences between the case at bar and the situations in *Faust* and *Gribaldo* that would justify moving our consideration of the dispute over pre-tender fees out of the analytical channel suggested by those authorities and into some different analytical track.

## 2. Section 554 of the California Insurance Code

■ The first alternative analytical candidate faces us in the form of section 554 of the California Insurance Code. That section declares that "[d]elay in the presentation to an insurer of notice or proof of loss is waived ... if he [the carrier] omits to make objection promptly and specifically upon that ground." It is not disputed that Safeguard did not promptly and specifically object to the Etchell's tender on the ground that it was made some eleven months after service of the Blasis' first complaint. In fact, Safeguard did not raise the issue of the timing of the tender until it filed its Opposition to the pending fees motion—some five years after the tender.

We have looked in vain for legislative history of section 554. Thus we have no historical basis for inferring that the legislature that adopted this section intended it to cover the kind of situation in which the Etchells find themselves.

We think it is significant, however, that none of the cases that directly address the enforceability of voluntary payment prohibitions even mentions this statute in passing, even though it has been in force in its current form since at least 1935. Section 554 is not cited or alluded to in *Gribaldo,* in *Fiorito,* in *Northern Insurance Company of New York,* or in *Faust.* While the (disputed) factual finding in *Gribaldo* that the insured never tendered the defense to the carrier might help explain the absence in that opinion of any allusion to section 554, no such possible explanation is available with respect to the other three cases—where tenders were made and eventually accepted, at least conditionally.

Nor is there a basis in these opinions for inferring that section 554 was not mentioned because the carriers in each case in fact made prompt and specific objection to the timeliness of the notice. While that possibility may exist, I think it is much more likely that this statute is not mentioned in any of these cases because none of the lawyers or judges involved in them thought the statute was relevant to the issues under consider-

ation. If the lawyers for the insureds had thought that section 554 might preclude the carriers from trying to escape responsibility for pre-tender expenses they surely would have so argued—and some allusion to these arguments presumably would have appeared somewhere in these opinions. But none does.

I suspect that the lawyers for the insureds did not try to invoke section 554 because they assumed that that section was applicable only when a carrier was trying to use an alleged violation of the prompt notice requirements to avoid *all* of its obligations under the insurance policy—rather than when a carrier was using a *different clause* in the insurance policy (the voluntary payment prohibition) for the much less ambitious purpose of trying to avoid payment of pre-tender fees. Indeed, I have found section 554 invoked by courts only in such cases—only where a carrier is trying to use a defect in notice to escape all liability under the policy. *See, e.g., Lagomarsino v. San Jose Abstract & Title Ins. Co.,* 178 Cal.App.2d 455, 459–60, 3 Cal.Rptr. 80 (First Dist.1960); and *Mercer Casualty Co. v. Lewis,* 41 Cal.App.2d 918, 108 P.2d 65 (First Dist.1940); *cf. Wilkinson v. Standard Accident Ins. Co. of Detroit,* 180 Cal. 252, 180 P. 607 (1919) (citing an old civil code section that pre-dated the adoption of the Insurance Code by the California legislature in 1935).

It also may be pertinent that at the time section 554 was adopted (1935 in its present setting—perhaps earlier in some other part of the codes), the scope of the duty to defend generally was understood to be appreciably narrower than it has since become. From 1918 through 1965 California courts generally permitted carriers to fix and limit the scope of the duty to defend on the basis of the formal allegations in the complaint against the insured. *See* Revere and Chapman, *Insurer's Duty to Defend,* 13 Pac.L.J. 889 (1982). It wasn't until 1966, when the California Supreme Court issued its seminal opinion in *Gray v. Zurich Insurance Co.,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966), that the duty to defend was expanded (many would say considerably) to its current reach. Under *Gray,* the duty is not limited

by the allegations in the pleadings; instead, it attaches whenever the litigation "potentially" exposes the insured to damages that would be covered. And in assessing the potential for coverage, *Gray* requires carriers to look well beyond the pleadings—to take into account information about the underlying events communicated by the insured or uncovered in the carrier's own investigation. Revere and Chapman, *Insurer's Duty to Defend, supra,* at 892–893; see also Miller, *The Insurer's Duty to Defend Made Absolute: Gray v. Zurich,* 14 UCLA Law Review 1328 (Note) (1967).

*Gray* was decided more than 30 years after section 554 was incorporated into the California Insurance Code. I suspect (but cannot establish) that carriers in that earlier period (the 1930's) focused more on the requirement of prompt notice than on the formalities of tender or the theory of volunteer payments. If so, in those earlier times it may well be that the principal target of the legislative arrow was the carrier who used notice requirements to try to escape responsibility for indemnity itself—rather than for the more limited purpose of cabining exposure to defense costs.

While the absence of authority directly on point precludes confidence about this matter, I infer that section 554 was intended to apply only when a carrier was trying to use failure to comply with prompt notice or proof of loss requirements to escape completely from its obligations under a policy—and was not intended to apply to the kind of situation presented by the pending motion, where a carrier is trying to use the voluntary payment clause only to avoid paying for those parts of the defense costs that were incurred before the tender was made.

### 3. Waiving Defects in Notice by Denying Coverage

■ Some of the cases cited by the Etchells suggest a second line of authorities which, it might be argued, justify moving analysis of the dispute over pre-tender fees out of the *Gribaldo—Faust* framework. There are many California cases in which the courts declare, usually with little explanation, that when a carrier denies coverage it waives

rights it otherwise might have had to contend that the insured failed to comply with notice or proof of loss requirements (or with any other provision included in the policy for the benefit of the carrier). *See, e.g., Wasson v. Atlantic National Ins. Co.,* 207 Cal.App.2d 464, 24 Cal.Rptr. 665 (Third Dist.1962); *Lagomarsino, supra; Comunale v. Traders & General Ins. Co.,* 116 Cal.App.2d 198, 253 P.2d 495 (Second Dist.1953); *Kennedy v. American Fidelity & Casualty Co.,* 97 Cal. App.2d 315, 217 P.2d 457 (Fourth Dist.1950); *Lincke v. Mutual Benefit Health & Accident Ass'n,* 76 Cal.App.2d 222, 172 P.2d 912 (Fourth Dist.1946); *Mercer, supra; Grant v. Sun Indemnity Co. of New York,* 11 Cal.2d 438, 80 P.2d 996 (1938); *Dietlin v. General American Life Ins. Co.,* 4 Cal.2d 336, 49 P.2d 590 (1935); *Hill v. Mutual Benefit Health & Accident Ass'n,* 136 Cal.App. 508, 29 P.2d 285 (First Dist.1934); *Wilkinson v. The Standard Accident Ins. Co. of Detroit, supra.*

The question, of course, is whether this line of cases controls, or even is relevant to, disposition of the parties' dispute over pretender fees.[12] It is clear that after the belated tender was made, Safeguard denied both defense and indemnity under the policy—both in early 1991 (four months after the initial tender) and again in May of 1993, after a second tender. Safeguard's initial rejection of the tender failed to specify any grounds at all for the denial of coverage. The second denial was based on substantive policy provisions: counsel for Safeguard wrote that "cov-

---

**12.** I do not think that the line of cases discussed in this section is over-ruled by the California Supreme Court's recent decision in *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 11 Cal.4th 453A, 44 Cal.Rptr.2d 370, 900 P.2d 619 (August 28, 1995). The pertinent part of that decision held that a carrier should not be deemed to have waived its right to rely in litigation on substantive policy provisions (limitations, definitions, etc.) to defeat coverage simply because the carrier failed to mention those specific policy provisions when earlier denying coverage.

California law recognizes more than one kind of waiver, or, more precisely, that there is more than one ground on which waiver can be based. As explained in the text, the cases discussed in this section appear to root findings of waiver in more than one legal theory or doctrinal tradition. The *Waller* court, however, dealt principally with only one kind of waiver, i.e., waiver with only one doctrinal foundation. *Waller* focused on classic common law waiver, where the goal is to determine whether the circumstances justify an inference that a party in fact intended to relinquish a known right. In contrast, the "waiver" that results from application of section 554 of the Insurance Code is not the product of a search for the actual intent of the party who held the right in issue. Rather, the legislature *imposes* this kind of waiver, in order to promote certain public policy goals or prevent certain perceived wrongs, wholly independent of the intentions of the holder of the right. In other words, these kinds of "waivers" are imposed legal fictions—and their existence does not depend on the real intentions of the parties on whom they are imposed.

Also as explained in the text, there seem to be three at least partially independent underpinnings for the findings of waiver in the *Wilkinson/Kennedy/Lagomarsino* line of cases: (1) the legal (as opposed to factual) notion that a carrier who repudiates a contract extinguishes it in its entirety and therefore cannot later invoke select-

ed provisions of it to avoid all liability under it, (2) the equitable notion that a carrier that discourages or prevents an insured from satisfying his contractual obligations should not be permitted to use the insured's failure to satisfy those obligations to avoid liability under the policy, and (3) the factual notion that certain behaviors by a carrier make it reasonable to infer that the carrier actually intended to forsake whatever right it might otherwise have had to use certain policy provisions to avoid liability. One reason that *Waller* cannot fairly be understood as over-ruling the line of cases discussed in the text is that *Waller* does not purport to discuss all of these different possible bases for finding or imposing a waiver.

There are two other reasons for which *Waller* is not relevant to the issue under consideration in the text above. First, *Waller* dealt only with waiver of substantive provisions in insurance policies, i.e., the clauses or provisions that purport to define, limit, and/or extend the reach of the policy (the real world risks/circumstances against which coverage is provided and those against which it is not). *Waller* did not purport to discuss waiver of rights a carrier might have under other kinds of clauses in an insurance contract, e.g., clauses that impose procedural or cooperation duties on the insured.

Second, the relevant sections of the *Waller* opinion neither mention nor cite any of the major cases in the *Wilkinson* line of authorities (where denial of coverage results in waiver of the right to invoke certain kinds of policy provisions in order to avoid all liability under a policy). Since we must assume that the California Supreme Court was well aware of this line of cases, we are confident that had the *Waller* majority intended to overrule them, it would have said so clearly (and spent considerable time justifying doing so). It is virtually inconceivable that the justices who joined *Waller* intended to overrule such a long line of cases *sub silentio.*

erage does not exist" for the Blasi claims because the policy did not reach intended damage or wilful acts and because the alleged conduct by the Etchells did "not constitute wrongful eviction or wrongful entry" as those phrases were used in the extended coverage endorsement. Claims File, C 0000118. Safeguard never purported to deny coverage based on the timing of the tenders, the voluntary payment prohibition, or any defect in notice or shortfall in cooperation.

The dispute on which we now focus is only about pre-tender expenses. Safeguard has not tried to use notice requirements or the voluntary payment provision to escape liability for either post-tender defense expenses or for indemnity. In that setting, we can frame the issue in this way: does the law deem a carrier to have waived its right to enforce a clause prohibiting voluntary incursion of pre-tender expenses when, much later, well after those expenses have been incurred, the carrier denies coverage on substantive policy grounds? I think not.

There are, principally, two grounds for my negative answer to this question. The roots for the first ground are found in *Kennedy v. American Fidelity & Casualty Co., supra,* one of the few opinions in this group of cases to even intimate a basis for the rule. The *Kennedy* court declared that because the carrier in that case "repudiated [the policy] in its entirety" with respect to the subject accident, the law could not permit the carrier "to rely upon one clause thereof *for the very purpose of continuing its denial of all liability under the policy.*" 97 Cal.App.2d at 317, 217 P.2d 457 (emphasis added). This passage suggests that one reason for the imposed waiver is to prevent carriers who have denied coverage from using provisions of the repudiated contract that imposed duties on the insureds as additional bases for denying *any and all liability* under the policies.

Some intimation of a similar theory informing this rule is suggested (admittedly not very directly) by a brief passage in *Dietlin, supra,* where the California Supreme Court stated that "where as here the defendant [carrier] denied all liability, there is a waiver of the condition requiring proof of loss, *if it be a condition precedent to recovery.*" 4 Cal.2d at 350, 49 P.2d 590 (emphasis added). By focusing on the fact that the clause the carrier was trying to invoke might serve (absent waiver) as a possible "condition precedent to recovery," the *Dietlin* court may have been suggesting that it, too, would root the imposition of the waiver in the notion that the carrier was trying to use the proof of loss clause as a means to avoid any liability at all under the policy.[13]

In the case at bar, however, Safeguard is not trying to use the voluntary payment provision to deny all liability under the policy. Instead, it is trying to use that provision only to reduce the extent of its responsibility for defense expenses. Thus the evil that the *Kennedy* court apparently thought was the basis for this particular waiver rule (the evil that consisted of a carrier repudiating a policy in its entirety and then trying to use duties that that very policy had imposed on the insured as additional bases for denying all obligations) simply is not threatened by the use of the voluntary payments provision that Safeguard proposes here. Again we emphasize that while Safeguard eventually repudiated the entire policy, it is not trying to use the clause in question to deny all liability.

The principal sources of the second ground for my conclusion that this line of authority does not compel the conclusion that Safeguard has waived its rights under the voluntary payment provision are found in two of the oldest cases on which this particular waiver rule is based: *Wilkinson, supra,* decided by the California Supreme Court in 1919, and *Hill, supra,* decided by the Court of Appeals in 1934. There is language in these cases that suggests a grounding of this particular waiver rule in two of the classic sources of waiver doctrine. One such classic basis of waiver doctrine focuses on determining whether the holder of the right knowing-

---

13. At the end of the quoted sentence, the *Dietlin* court cited *Hill* and *Wilkinson,* discussed in the text, below—which might mean that the *Dietlin* panel believed that the roots of the waiver in question were to be found, instead, in traditional doctrines that focused on the intentions of the holder of the right and on principles of equitable estoppel.

ly intended to relinquish it. The second basis focuses on whether it would be unfair to the alleged 'victim-party' not to estop the holder of the right from invoking it because conduct by the holder of the right either prevented the victim from meeting his obligations under the contract or induced the victim to believe that meeting those obligations would have no effect on whether the holder of the right would decide to perform under the contract.

The most instructive language is from the California Supreme Court's opinion in *Wilkinson.* There the Court, in affirming a decision that would permit a claimant to proceed against the carrier, pointed out that, under the allegations, the insured orally provided complete proof of the circumstances of the loss, and requested the forms necessary to formally present the claim, but the carrier "refused to furnish to plaintiff the blank form of proofs and denied all liability upon the policy, and informed plaintiff that it was useless for her to make proof of loss. Such denial of liability constitutes a waiver of the condition requiring proof of loss." *Id.* at 258, 180 P. 607 (citations omitted). As here described, the carrier's conduct discouraged and prevented the claimant from complying with the contractual condition that the carrier was trying to interpose as a basis for denying liability (key elements of grounds for equitable estoppel) and appeared to evidence a decision by the carrier to forsake any reliance on that condition—by suggesting that even if the claimant satisfied the condition, the carrier still would deny coverage (apparent voluntary relinquishment of a known right).

Some of the same doctrinal underpinnings for the finding of waiver also are reflected in *Hill, supra,* where the Court of Appeals pointed out that the plaintiff had given the required notice as soon as reasonably possible, had taken all subsequent steps necessary to comply with the provisions in question, but the carrier nonetheless had both denied "all liability" for the loss and had refused to "furnish the forms for the proof of loss". The *Hill* court held that the denial of all liability under these circumstances, in combination with the refusal to furnish the forms,

"doubtless operated as a waiver of the condition requiring proof of loss." 136 Cal.App. at 512, 29 P.2d 285.

A comparison of these cases and the considerations that seem to inform the finding of waiver in them with the facts of the case at bar suggests that the District Court should decline to hold that Safeguard waived its right to enforce the voluntary payment provision by eventually denying all liability under the Etchells' policy. There is no reason to believe that by denying all liability on substantive coverage grounds Safeguard in fact intended to give up the right to limit the extent of its exposure for fees and costs, i.e., to forsake its right to maintain those outside boundaries on its exposure for which it bargained when it agreed to issue the insurance policy in question. Safeguard never intimated that it would have been pointless for the Etchells to have tendered promptly after being sued. And the voluntary payment provision has independent contractual viability, i.e., it was intended to operate to fix limits on the amounts for which Safeguard would be liable even if Safeguard lost its independent arguments (based on substantive coverage provisions) that it was not liable under the policy at all.

Nor are the equitable grounds for a finding of waiver that were present in *Wilkinson* and *Hill* present in the case at bar. Safeguard took no action to prevent or discourage the Etchells from promptly tendering their claim. Safeguard did not. refuse to provide the Etchells with forms necessary to make the tender. Prior to the initial tender, Safeguard did nothing to communicate to the Etchells, or to induce them to infer, that it would be "useless" for them to comply with the voluntary payment provision. *See Wilkinson, supra,* 180 Cal. at 258, 180 P. 607.

In sum, it appears that the case at bar does not present either the legal or the equitable grounds on which the California courts have based their rulings that carriers that deny liability waive their right to invoke certain kinds of policy provisions to try to escape all liability.

#### 4. Third Party Claims and the Requirement of Prejudice

■ At this juncture we turn to the third possible alternative to the *Gribaldo–Faust* framework for analyzing the pre-tender fee dispute. This alternative, also urged by the Etchells, is found in the California cases that prohibit carriers who are defending against third party claims from using a failure by their insured to comply with notice or cooperation clauses to escape liability unless the carriers can show prejudice caused by the failure. *See, e.g., Clemmer v. Hartford Ins. Co.,* 22 Cal.3d at 881–884, 151 Cal.Rptr. 285, 587 P.2d 1098; *Campbell v. Allstate Ins. Co., supra.* Consideration of this possible alternative need consume much less of our time. First, we note that the *Faust* court, by whose pertinent opinions we are controlled, expressly addressed and distinguished this line of cases, concluding that they required a showing of prejudice only because in them the carrier was trying to use an alleged breach of the notice or cooperation clause to escape all liability under the subject insurance policies. *Faust,* 55 F.3d at 472–473.

There is an additional, potentially significant basis for distinguishing the case at bar from *Clemmer* and *Campbell* (and from the opinions on which *Campbell* principally relies). In those cases, a carrier was being sued not by its own insured (as is the case here), but by a third party who already had obtained a judgment against the carrier's insured for harm caused by the insured. These judgments remained unsatisfied and were based on harms for which the carrier arguably had agreed to provide coverage. In those settings, the courts appear to have felt a special need to prevent carriers from being able to use inconsequential shortfalls in contractual performance by their insureds, people over whom the victim third parties had no control, to escape liability—and thus to leave the harms caused by their insureds unredressed. In short, it appears that the courts were driven to establish the requirement of a showing of prejudice (to the carrier caused by the insured's failure to comply with a contractual condition precedent) both by proven needs to provide compensation to innocent parties from the only source available [14] and by concern that without such a requirement it would be too easy and too tempting for carriers and their insureds to enter agreements (collusion) under which the insureds would intentionally not satisfy some condition precedent under the policy in order to insulate the carriers from liability to the victim of the insured's negligence.

The case at bar, of course, does not involve a claim by an injured third party who has secured a judgment against the insureds. Since our case does not involve that situation, it also does not implicate the reasons for which the requirement of a showing of prejudice was imposed.

For the reasons set forth in the preceding three subsections, I have concluded that none of the possible grounds for moving analysis of this issue out of the *Gribaldo–Faust* framework is persuasive.

My feeling that the disposition I am recommending of this issue accurately predicts how California courts would resolve this aspect of the parties' dispute is bolstered by the spirit and tone of the recent opinion of the California Supreme Court in *Waller v. Truck Ins. Exchange, Inc., supra.* In that opinion, as discussed in greater detail in other portions of this Report, the Court in essence refused to permit waiver doctrine to create contractual duties where none existed before. In that sense, *Waller* appears to be grounded in an effort to preserve for both parties to the underlying original contract the essential terms for which they bargained.

■ In so grounding itself, *Waller* has roots in a long-standing practice by California courts in this arena: the practice of focusing on expectations of the contracting parties that would be reasonable under the circumstances as known at the time of entering the contract. Working from that per-

---

**14.** *Cf. Clemmer,* 22 Cal.3d at 882, 151 Cal.Rptr. 285, 587 P.2d 1098, where, rejecting the carrier's contention that prejudice should be presumed whenever there is a breach of the cooperation clause, the Court emphasized that such a "pre-sumption would not be in keeping with the public policy of this state to provide compensation for those negligently injured in automobile accidents through no fault of their own."

spective, I do not believe that California courts would hold, in the current doctrinal climate, that an insured could reasonably expect to escape the limited consequences of making a very tardy tender (not being reimbursed for pre-tender defense expenses) on the ground that its carrier later, for independent reasons, denied coverage. In other words, California courts would deem a reasonable insured to understand that if he incurred expenses well before tendering the defense, with no apparent excuse for not seeking, much earlier, the permission and participation of the carrier, he would not be able to collect under his policy for those expenses. Instead, a reasonable insured would be deemed to understand that there would be real (but finite) consequences to him if he breached, without excuse, his duty to give the carrier an opportunity to get involved at the outset of the litigation. Stated differently, the courts would hold that a reasonable insured would understand that the clause in the contract prohibiting voluntary payments operated independently of those other clauses in the contract that imposed substantive obligations on the carrier.

Having considered and rejected the various bases on which an argument might be made that some line of authority other than *Gribaldo–Faust* should control disposition of the dispute over pre-tender fees, I RECOMMEND that the District Court follow *Gribaldo* and *Faust* and DECLINE to include in the award in this matter any compensation for fees or costs incurred before September 4, 1990, the date the Etchells first tendered this matter to Safeguard. Because the Etchells have not challenged Safeguard's contention that the amount of such fees and costs is $31,791.25, I RECOMMEND that that sum be subtracted from the Etchells' fee and cost award.

**B. Expenses Incurred After the Court of Appeal Reversed the Damages Award**

■ Safeguard contends that it should not be liable for any of the $8,851.82 in fees and costs incurred after the intermediate appellate court affirmed the quiet title and injunc-

tive portions of the trial court's judgment, but reversed the damages award. In support of this contention, Safeguard argues that "the reversal of the damages on appeal eliminated the potential for covered liability" because the policy offered coverage only against damages, not against other kinds of judicial relief. Safeguard's Opposition to Plaintiff's Memorandum Re Fees, filed September 28, 1995, at 9.

■ We need not be detained long by this argument for the simple reason that it ignores the obvious possibility that the Blasis, who had proven themselves to be tenacious litigators, and who had secured an award of well over $154,000 from the trial court, would appeal the Court of Appeals' ruling on the damages claims to the Supreme Court of California—and then persuade that Court to reinstate the damages award. "Under California law, the insurer's duty to defend does not cease until the final determination of the underlying action on appeal." *CNA Casualty of California v. Seaboard Surety Co.,* 176 Cal.App.3d 598, 618, n. 10, 222 Cal.Rptr. 276 (First Dist.1986); *see also Arenson v. National Automobile & Casualty Ins. Co.,* 48 Cal.2d 528, 310 P.2d 961 (1957).

Even if Safeguard could establish that the equitable and quiet title claims were clearly separable from damages claims (see below), it is clear that there could be no "final determination" of the underlying action until the time for the last possible appeal had lapsed. Since Safeguard does not contend that the Etchells are seeking fees or costs incurred after the time to appeal had expired, I RECOMMEND that the District Court REJECT this challenge to the Etchells' claim.

**C. Fees for Researching a Possible Appeal to the Supreme Court on the Issue of Public Dedication**

■ Safeguard next contends that even if we are not persuaded that the decision by the Court of Appeal cut off the Etchells' entitlement to any fees or costs incurred thereafter, we should nonetheless reduce the award by $4,191.00,[15] the amount that Safe-

---

**15.** In Safeguard's Opposition memorandum it also asks us to reduce the award by $1,353.00,

an amount attributed to hours allegedly committed by Mrs. Etchell to preparation of the same

guard claims Wilson billed for work preparing to attack in the Supreme Court those portions of the judgment that the Court of Appeal had affirmed—the quiet title and the injunction. Again Safeguard premises this contention on the notion that coverage under the Etchells' policy could extend only to damages claims, not to other forms of relief.

There are several difficulties with Safeguard's position on this matter. First, Safeguard has failed to carry its burden of proving that the hours challenged here were in fact committed to work on the quiet title and injunction aspects of the possible appeal. Mr. Wilson testified that he was apprehensive that the Blasis would appeal the reversal of the damages judgment—and Safeguard has failed to present evidence from which we can infer with confidence that the hours here challenged were not devoted to preparing to meet the possible appeal by the Blasis of the Court of Appeals disposition of the clearly covered claims.

Second, it is not at all clear (and the burden is on Safeguard to make it clear) that it would not have been appropriate to attack the rulings on the "issue of the public dedication" as an integral part of a reasonable defense of the Etchells on the concededly covered claims—the claims that gave rise to the damages. If the Etchells could show that the trial and appellate courts had erred in finding that there had been a public dedication of the subject property they would thereby open up the possibility of being able to show that the Etchells had the kind of interests in the property that would have compelled the conclusion that the conduct on which their liability had been based was lawful. Stated differently, counsel for the Etchells could reasonably have concluded that it was necessary to attack on appeal the rulings on the public dedication issue in order to shatter the underpinnings for the trial court's findings that the Etchells' actions were wrongful (tortious).

The fact that the Court of Appeal based its reversal of the damages award on grounds of causation is in no sense dispositive here.

The Etchells could reasonably have feared a scenario in which the Supreme Court would reverse the intermediate appellate court's ruling on the causation issue. In short, the Etchells could not count on escaping liability for the damages on grounds of causation—and if they lost that basis for avoiding liability in the Supreme Court, they would need another, more fundamental ground for protecting themselves. That ground could consist of persuading the Supreme Court that the trial court and the Court of Appeal had ruled erroneously on the title issues—and that the Etchells had the kind of ownership interests that made their conduct (blocking access to the road with the gate and the vehicle) entirely lawful. If the Etchells could get the title rulings reversed, they could show, in the language of the insurance policies, that their conduct did not constitute either "wrongful eviction" or "wrongful entry". Thus, by preparing to attack the title rulings, if that is what he was doing, the Etchells' attorney was defending against covered claims.

It follows that I RECOMMEND that the District Court also REJECT this proposed ground for reducing the fee and cost award.

### D. Allocation Between the Main Action and the Eminent Domain Action

Safeguard objects to paying the fees and costs the Etchells incurred in defense of the condemnation action (No. 179390). Because Safeguard already has succeeded in persuading me that the Etchells are not entitled to reimbursement under their policy for *any* of the fees and costs they incurred *before tendering* defense of the main action (see above), the only fees and costs connected with the condemnation action that are in issue here are those that were incurred after their first tender of the damages/injunction action (after September 4, 1990). According to Safeguard's unchallenged calculations, these separately designated fees amount to $4,439.50.

appellate attack. During the hearing on this matter, however, the Etchells withdrew all claims based on work performed on this matter

by Mrs. Etchell. Thus there is no occasion to consider reducing the award by this amount.

Safeguard has articulated in its papers only one basis for this separate challenge: according to Safeguard, because the Etchells never tendered defense of the eminent domain action, the carrier never had a contractual duty to provide a defense to it.

The Etchells have not proven in these proceedings that they ever separately or explicitly tendered defense of the eminent domain. They never clearly demanded that Safeguard defend them in the condemnation proceedings and never forwarded to Safeguard any papers filed in those proceedings (e.g., they never sent Safeguard a copy of the eminent domain complaint). While they tendered the damages action on two different occasions (in September of 1990 and April of 1993), both of which were well after the Blasis had initiated the condemnation action (in early February of 1990), their tender letters included not even an allusion to the eminent domain case.

 While there is no evidence that the Etchells ever explicitly tendered defense of the condemnation action, Safeguard does not deny that it had acquired actual knowledge of that proceeding by August of 1991. In an internal memorandum in its claims file, a Safeguard claims manager made notes of a phone conversation with Edwin Wilson's secretary on August 12, 1991. Those notes state:

> Wilson on vacation—spoke to his secty, Jackie. 2 trials—177104 just heard—judge has not rendered decision. 2nd trial—179390—Condemnation proceeding—set Sept. 3.
>
> Told Jackie based on what I have denial is in order, however, I do not wish to proceed w/ that until I have heard Etchell's side of the story. Wilson will be back August 19. Call then. Claims File, at C 0000064.

The Etchells contend here that this communication by Safeguard's claims manager to Mr. Wilson's secretary constitutes a denial of coverage of the condemnation action ("a denial of the condemnation claim was made to Wilson's secretary on August 12, 1991," Plaintiffs' Closing Brief Re Fees, filed October 12, 1995, at 24). While this communication might have discouraged Wilson and the Etchells from formally tendering the condemnation proceeding after August 12, 1992, California courts probably would be reluctant to conclude that a carrier could make a denial without first having received a tender. And the Etchells do not claim that the information about the eminent domain action provided orally by Wilson's secretary in response to the claims manager's telephone call constituted a tender.

It is not clear why the Etchells never tendered this matter—especially in the period before January of 1991, when Safeguard formally denied coverage of the damages action. It is possible that the Etchells and Wilson assumed, as he suggested in his testimony at the October 27, 1995 hearing, that their tender of the defense of the main action necessarily embraced a tender of the condemnation action. It also is possible that they never tendered defense of the eminent domain case because they did not believe their insurance policy offered coverage for it. It also could be that the failure to tender was simply an oversight. It is not clear that California courts would hold that a carrier never could acquire a duty to defend solely because the insured failed to make a formal tender. Timely actual knowledge by the carrier of the *substance of a possibly covered lawsuit* (cf. *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)), coupled with good reason to believe that the insured wanted the carrier to assume responsibility for the defense, might well be sufficient to trigger the duty, especially given the strong statements in California cases about the at least quasi-fiduciary responsibilities of carriers to their insureds. *See, e.g., Barney v. Aetna Casualty & Surety Co.*, 185 Cal.App.3d 966, 230 Cal.Rptr. 215 (Second Dist.1986).

It is clear, however, that a carrier has no obligations with respect to a lawsuit about which it has no knowledge. *See Faust v. The Travelers, supra.* Since the Etchells have failed to establish in the proceedings before me that Safeguard had any knowledge of the condemnation action until August 12, 1991, Safeguard should be liable for no fees or costs incurred in that matter before that date.

This conclusion does not fully resolve the dispute about the condemnation action, however, because the Etchells also are claiming fees incurred in that action after August 12, 1991. Because I have declined to hold that the telephone communication with Wilson's secretary on August 12, 1991, constitutes a rejection of a tender or a denial of coverage with respect to the eminent domain proceeding, and because there is no evidence that Safeguard ever otherwise purported to deny coverage of that separate action, no conduct by Safeguard (that has been proven before me) with respect to the eminent domain proceeding itself can give rise to rights in the Etchells, free them from otherwise applicable contractual obligations, or impose waivers or other restrictions on Safeguard.

The Etchells would argue, however, that Safeguard's duty to defend the main action is broad enough to encompass defense of the condemnation action as well. In assessing this contention we must take care to distinguish two different analytical settings. The first such setting would involve a direct examination of the terms of the subject insurance policy and the claims in the eminent domain action—to determine, under the *Gray v. Zurich, supra,* test, whether there was any meaningful possibility that adjudication of the case could result in an adverse judgment with at least one covered component. I believe that such an analysis would result in a conclusion that Safeguard had no duty to defend the Etchells in the condemnation action—largely because in that proceeding the Etchells had no exposure to damages of any kind. The only relief the Blasis sought vis-a-vis the Etchells in that action was acquisition of "an easement appurtenant to provide utility services to ... Bella Vista

Estates." Clerk's Trans., Vol. III (eminent domain), at 00002.

Another consideration supporting the same conclusion is that neither the character of nor the motives for the conduct by the Etchells that was alleged in the damages action to be wrongful was relevant to disposition of the eminent domain complaint.[16] Under the statute on which the eminent domain action was based, California Civil Code Section 1001, the Blasis could prevail by showing that (1) "[t]here is a great necessity for the taking," (2) that the easement would afford "the most reasonable service to the property to which it is appurtenant, consistent with the least damage to the burdened property," and (3) that the "hardship to the owner of the appurtenant property, if the taking is not permitted, clearly outweighs any hardship to the owner of the burdened property." To make these showings, it was not necessary for the Blasis to prove that the Etchells had ever acted wrongfully or that they had no adverse easement or fee interests in Borel Road.[17] And full proof of everything required of the Blasis in the condemnation action would not have entitled them to a dime of damages from the Etchells.

It is important to bear in mind here that under Judge Armstrong's Order Granting Plaintiffs' Motion for Summary Judgment, the allegations by the Blasis in the main action that triggered the duty to defend in that action were the allegations that the Etchells had interfered with the Blasis possessory rights in Borel Road. And the specific conduct that Judge Armstrong cited from the Blasis' complaint that allegedly caused and constituted that interference was erecting the fence across the road and parking the vehicle behind it. *Order,* filed June 20, 1995, at 16. It was this alleged conduct that,

---

16. As noted in the Findings of Fact, above, in at least one of the papers they filed in the eminent domain action the Blasis did describe and condemn as wrongful Robert Etchell's physical interference with installation of the utilities. But, as explained in the text, above, this 'information' was gratuitous. The Blasis may have included it to try to curry sympathy with the judge, but it was not relevant to determining whether the parcel should be condemned under the law on which this suit was based.

17. To satisfy the "great necessity" requirement the Blasis would be asked to show that the condemnation they sought was "the sole reasonably acceptable means for providing utility service" to their property. *L & M Professional Consultants, Inc. v. Ferreira,* 146 Cal.App.3d 1038, 1051, 194 Cal.Rptr. 695 (Fourth Dist.1983). Thus, the focus of their evidence and argument would be on the absence of reasonably acceptable non-condemnation alternatives to accomplish their physical objective, not on title issues and not on the defendants' conduct when they blocked the road or tried to acquire title to it.

according to Judge Armstrong, could be deemed "wrongful eviction" or "wrongful entry"—thus triggering coverage.

In their "Complaint for Eminent Domain" the Blasis made no allusions to the Etchells erecting fences or using vehicles to block the roadway. In fact, the complaint in the condemnation action did not accuse the Etchells of engaging in any wrongful conduct at all— much less any conduct that might constitute "wrongful eviction" or "wrongful entry." So the key factual allegations that gave rise to coverage in the main action were missing entirely from the complaint in the eminent domain proceeding. Their absence is fatal to a contention that Safeguard would have been obligated to provide a defense to that separate action if the Etchells had tendered it.

It is at least arguable, however, that Judge Armstrong's ruling that Safeguard wrongfully denied the Etchells' tender of the defense of the separate damages case triggers a second, separate analysis of the remaining part of this dispute over fees incurred in the condemnation action. By wrongfully denying defense of the main action, Safeguard exposed itself to a separate and more demanding analysis about the reach of its defense obligations. The seminal California case that describes the pertinent analytical framework is *Hogan v. Midland National Insurance Co.*, 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825 (1970).

*Hogan* confirmed that where a carrier has breached its obligations to its insured by wrongfully refusing to provide a defense the general rule, subject only to a narrow exception, is that "the insurer is liable for the total amount of the fees despite the fact that some of the damages recovered in the action against the insured were outside the coverage of the policy." *Id.* at 564, 91 Cal.Rptr. 153, 476 P.2d 825. This generalization applies to causes of action or claims ("various [legal] theories", *id.* at 563, 91 Cal.Rptr. 153, 476 P.2d 825) as well as to various elements or components of damages. So the general

rule is that a carrier that breached its duty to defend is presumptively liable for the costs of defending the entire litigation, even if some of the claims, standing alone, would not have given rise to coverage.

The narrow exception that the *Hogan* court acknowledged arises only when the "insurer produces undeniable evidence of the allocability of specific expenses". *Id.* at 564, 91 Cal.Rptr. 153, 476 P.2d 825. The Supreme Court imposed this "heavy burden" [18] on the carrier in this setting both because it had breached its duty to its insured and because, as a practical matter, the Court recognized that in most settings it would be extremely difficult to determine, with an appropriate level of confidence, that some litigation expenses were attributable solely to uncovered claims, causes of action, or damages. *Id.*

Before proceeding, we note that no California court has held that the *Hogan* analysis applies when the issue is not the extent of the duty to pay defense costs that arose in one case, but whether that duty extends beyond one case to another. While the condemnation action proceeded over roughly the same time frame as the main action and arose out of the same real world differences between the same parties, and while the two actions had some evidence in common, they were formally separate cases. I do not believe, however, that that formality, standing alone, would foreclose the possibility of a California court applying an essentially *Hogan* analysis to the issue under consideration here. If the facts were right, a California court might rely on *Hogan* to decide that a duty to defend in one case was broad enough to impose a duty to defend in another case.

I also do not believe, however, that the facts are right for such a holding in the case at bar. En route to this conclusion, I have assumed that California courts probably would reduce, perhaps very modestly, the severity of the burden of proof imposed on a carrier when the dispute involves two sepa-

---

**18.** Exactly how demanding this burden is remains open to argument, but it obviously is heavier than the burden imposed by the preponderance of the evidence standard. *Cf. Bertero v. National General Corp.*, 13 Cal.3d 43, 63, 118 Cal.Rptr. 184, 529 P.2d 608 (1974). I assume that a carrier with this heavy burden would be required by California courts to satisfy at least the "clear and convincing" standard of proof.

rate cases instead of two separate causes of action within one case—especially where, as here, there has been no tender in the second case. But I also conclude that, with respect to the separate condemnation action, Safeguard could satisfy even an undiluted version of the *Hogan* test. In other words, Safeguard can meet its heavy burden of producing undeniable evidence that the expenses incurred in defense of the condemnation action after August 12, 1991, are clearly separable from the expenses incurred in the damages action.

There was no necessary legal overlap between the two actions. And if the judges in each case enforced the applicable relevance norms, the evidentiary overlap would not have been considerable. Contrary to the suggestion made by plaintiffs, it was not necessary for the Etchells to defeat the condemnation action in order to successfully defend the main action. As far as I can tell, whether the Etchells were the owners of the disputed parcel, and whether they had acted lawfully or wrongfully in early October of 1989 when they blocked the road, were not material to whether the Blasis could establish the three statutorily prescribed elements necessary to persuade the condemnation court to grant them a *prospective* easement appurtenant over the property for the purpose of installing utilities. And that was the sole relief prayed for in the eminent domain action. Since the trial judge in the condemnation action should not have permitted the Blasis to try to prove that the Etchells acted wrongfully when they blocked the road, I do not see how, as a matter of law, losing the condemnation action could increase the risk that the Etchells would lose on covered claims in the damages action. Thus, even as a matter of collateral estoppel, the two actions did not overlap.

The relationship between the eminent domain action and the Etchells' cross-complaint in the damages action is a bit more complicated, but does not justify ordering Safeguard to pay fees and expenses incurred only in the condemnation proceedings. As I explain in the next section, Safeguard has failed to prove with "undeniable evidence" that some of the fees that Safeguard attrib-

utes to the cross-complaint are clearly allocable solely to the prosecution of the claims made in that cross action. Where it is unclear which pleading (the Blasis' complaint or the Etchells' cross-complaint) generated the need for the work, or where it appears that challenged legal work might well have benefited the prosecution of the cross-complaint, but also reasonably could have been undertaken in defense of the Blasi action, *Hogan* and its progeny require us to include these fees in plaintiffs' award. In other words, California courts would hold that the duty to reimburse the Etchells for expenses incurred in defending the covered Blasi claims can reach some expenses that also happened to benefit the prosecuting of the cross-complaint.

It would not follow from these conclusions, however, that expenses incurred in the eminent domain action also are chargeable to Safeguard. In other words, California courts would not permit the Etchells to bootstrap reimbursement of expenses incurred in the condemnation proceeding through Safeguard's failure of allocation proof as between defense of the main action and prosecution of the cross-complaint in that suit. In other words, failure to adduce undeniable evidence of allocability with respect to some expenses connected with the cross-action within the damages litigation by no means makes inevitable a failure of proof with respect to a separately filed condemnation proceeding.

The separation between the condemnation action and the cross-complaint in the damages action was much greater than the separation between the Blasis' complaint in the damages action and the Etchells' cross-complaint within that same proceeding. This greater separation was partly (but not most importantly) a matter of formalities of pleading. The cross-complaint was filed within the same action as the covered claims, and apparently had to be litigated there or lost forever. The condemnation action, by contrast, was filed as a separate proceeding, with a distinct statutory predicate, and handled most of the time by different judges. These considerations probably would make a California court somewhat more reluctant to extend Safeguard's obligation to fund the

defense of the damages action to expenses incurred in the condemnation action.

Appreciably more significant, however, is the relative separation in the spheres of evidence, law, and necessary litigation activity. The cross-complaint sounded essentially in trespass. In it the Etchells alleged that they had easement and fee interests in the disputed parcel that the Blasis had invaded, wrongfully, by cutting trees, installing utilities, and altering the roadway (including curbs and gutters). The Etchells prayed for damages for these past invasions of their alleged property interests. Their pleading also asked the trial court to enjoin the Blasis from invading these interests in the future.

It was only in the prayer for prospective equitable relief that the cross-complaint and the eminent domain action intersected. If the eminent domain action had gone to trial first (in fact it never went to trial), and if the Etchells had lost in that proceeding, the Blasis would have gained their prospective easement rights and the Etchells' pursuit of an injunction through their cross-complaint in the damages action presumably would have been foiled.

But this practical intersection in the relief portions of the two suits did not necessitate any substantial overlap in evidence, legal research/argument, or other litigation activity. I repeat a point made earlier: who owned what rights in the disputed parcel, and what conduct the various claimants had engaged in on that parcel, were not issues of great consequence under the eminent domain statute whose requirements the Blasis were required to meet in the condemnation proceeding. So under the pertinent eminent domain law, that action could proceed to judgment with little or no attention to the matters on which the cross-complaint in the damages litigation would turn. Given that fact, I believe that California courts would conclude that Safeguard has met its heavy burden of proving separate allocability with respect to the condemnation action.

At a practical level, Safeguard's success in meeting this heavy burden is attributable to two factors. First, Safeguard has not overreached in this part of its challenge by trying to attribute expenses to the condemnation action for which clear proof of allocability is not available. Second, the clear evidence on which Safeguard relies comes directly from the undisputed records of counsel for the Etchells. Safeguard has attempted to attribute to the condemnation action only those fees that Edwin Wilson himself, in his time sheets, explicitly charged to the condemnation action (through notations such as "condemn" or "cond")—notations whose meaning Wilson has not disputed. Given the source of this evidence, and the fact that the Etchells cannot dispute it, I RECOMMEND that the District Court find that Safeguard has met its burden of establishing the allocability of the condemnation expenses. It follows that I RECOMMEND that the District Court also deduct from the fee/cost award the remainder of the fees that were incurred separately in the condemnation action.

### E. Allocation Between Defense of the Main Action and Prosecution of the Cross–Complaint

■ Citing only one case as authority, *Barney v. Aetna Casualty & Surety Co.*, 185 Cal.App.3d 966, 230 Cal.Rptr. 215 (Second Dist.1986), Safeguard asserts that there is "no duty on behalf of a carrier to prosecute a cross-complaint for affirmative relief."

*Barney* does not so hold. Rather, that case involved a determination about whether a carrier could be guilty of bad faith if it settled a cross-claim that its insured was prosecuting (without financial support provided by the carrier) without the knowledge or consent of the insured, as part of a package deal purporting to settle a claim against the insured (the defense of which the carrier was providing). The *Barney* court does not purport to address the issue of whether a carrier's duty to defend a claim against its insured might, in some circumstances, also require the carrier to fund the prosecution of a cross-complaint.

The only basis Wilson offers for his contention that Safeguard should be obligated to reimburse the Etchells for expenses incurred in connection with the prosecution of the cross-complaint is this: the filing of the cross-complaint, he asserts, was in part "a

calculated defense strategy to put pressure on the Blasi plaintiffs. Thus, as the primary purpose of the cross-complaint was to put pressure on the defendants as part of the overall strategy in the defense of the Etchells, the carriers [sic] are obligated to reimburse the plaintiffs for the fees and costs incurred in pursuing the cross-complaint." Plaintiffs' Closing Brief Re Fees, filed October 12, 1995 at 25. Counsel for the Etchells cites no authority for this argument—because there is none. It cannot support the Etchells' position on this issue.

■ What the California cases preclude a carrier in Safeguard's position from doing is second-guessing tactical decisions *within* the defense sphere;[19] the authorities do not purport to address whether the duty to defend might extend to funding the prosecution of related *offensive* causes of action, even when such offensive efforts are considered part of a larger defensive strategy by the insured and her lawyer. It also is noteworthy that the Etchells have pointed to no language in their insurance policy that intimates that the duty to defend might reach "tactically" inspired offensive counter-attacks (cross-complaints or counter-claims).

■ The upshot is that neither Safeguard nor the Etchells have provided the court with a reliable basis for resolving this component of their dispute. We look instead to *Hogan* and its progeny. When the evidence and law on which litigation of the cross-claim would turn overlap heavily with the evidence and law on which litigation of the defended claim would turn, I believe that California courts would apply the demanding *Hogan* test to a carrier who had breached its duty to defend and who wished to avoid paying for expenses that it attributed to the prosecution of the cross claim.

Under that demanding test, the carrier would be required to produce "undeniable evidence" that the expenses in question were generated only by the needs of the cross-claim, i.e., would never have been incurred if the only litigation activity had been defending against the claims in the complaint.

There was a great deal of overlap in the underlying action between the evidence and law made relevant by the claims in the Blasis' complaint and the evidence and law made relevant by the claims in the Etchells' cross-complaint. To prevail on their cross-complaint, the Etchells would be required to prove that they had easement and ownership interests in the disputed parcel that were superior to any such interests held by the Blasis and under which it was wrongful for the Blasis to cut the trees, install the utilities, and make the changes in the roadway. Had the Etchells proved that they had such superior fee or easement rights in the parcel, they would have effectively eliminated the predicate for a finding that their conduct in interfering with the Blasis' use of the roadway was tortious. One issue at the heart of both pleading was this: who had superior rights in the parcel. Much of the litigation activity focused on matters relevant to that issue.

In this setting, California courts would permit Safeguard to escape liability for fees or costs incurred in prosecution of the cross-complaint only if Safeguard could adduce undeniable evidence that the challenged fees or costs would not have been incurred but for the filing of the cross-complaint.

Safeguard has failed to make a showing of the required clarity (of allocability) with respect to most of the fees it challenges here. Aside from time and money committed to developing expert testimony about the value of trees along the road, Safeguard claims that Wilson billed 14.1 hours to prosecuting the cross-complaint. Of these challenged hours, only 0.4 (four tenths of one hour) are clearly chargeable, as indicated by the notations in Wilson's time sheets, only to the cross-complaint.[20]

**19.** *See, e.g., Arenson v. National Automobile and Casualty Insurance Co.*, 48 Cal.2d 528, 538–39, 310 P.2d 961 (1957), where the State Supreme Court rejected a carrier's effort to "whittle down" the defense cost award on the ground that the "defense was not handled in a manner to the liking of the company" and affirmed that the

carrier's duty reaches "fees for all services reasonably performed *in such defense.*" (emphasis added).

**20.** These are the separate entries dated 1/14/91, 1/16/91, and 1/30/91.

The ways the entries are made on the time sheets makes it impossible to determine, with respect to the remaining 13.7 hours, how much time was devoted to work only on the cross-complaint and how much time was devoted to the defense of the Blasis' complaint. In each of these remaining entries [21] there is a reference to the cross-complaint, but there also is a reference to matters apparently pertinent to the main action, e.g., "trial prep" or "review file". And in none of these entries did Wilson designate how much of the total (e.g., 2.0 hours) he devoted to any one of the activities listed.

■ While more precise billing allocation by Wilson would be desirable, there is no reason to believe, given how common such 'block' billing is, that he intentionally built this kind of blur into his records. Given the absence of a basis for such an inference, *Hogan* and its progeny compel us to resolve ambiguities or uncertainties of these kinds against the carrier, as it already has been found to have wrongly denied coverage. *Cf. Arenson*, 48 Cal.2d at 539–540, 310 P.2d 961 (declaring that "[i]f there be uncertainty as to the nature or extent of the services reasonably to be rendered by counsel engaged by the insured, that uncertainty must be resolved against defendant insurer"; also citing with approval the following passage from *Speegle v. Board of Fire Underwriters*, 29 Cal.2d 34, 46, 172 P.2d 867 (1946): " '[T]he wrongdoer shall bear the risk of the uncertainty which his own wrong has created.' ").

I therefore RECOMMEND that the District Court reduce this specific sub-set of challenged fees by only 40% of the value (at that time) of one hour of Mr. Wilson's time (0.40 × $130): $52.00.

Safeguard also contends that the Etchells incurred expenses that are attributable only to their effort to establish the magnitude of damages they claimed in their cross-complaint. Specifically, Safeguard contends that

the Etchells retained expert Michael Mahoney solely to present evidence about the value of the trees that allegedly were damaged by the Blasis. Even though Mr. Mahoney's deposition was taken on September 6, 1990, several months before Wilson filed the cross-complaint, the Etchells do not contest Safeguard's contentions about the purposes for which Mahoney was retained or the matters to which his testimony was pertinent.

Nor do the Etchells' specifically contest the amounts that Safeguard contends are chargeable to developing and presenting Mr. Mahoney's deposition testimony: $101 for the reporter's fee, $200 for Mahoney's fee, and $390 (three hours at $130 per hour) for Wilson's fee. The only element of these claims as to which there is some uncertainty in the billing documents is Wilson's time. His time sheets for September 6, 1990 [22] indicate that he spent no more than 2.5 hours preparing for and attending Mr. Mahoney's deposition. Thus, on the record before me, I RECOMMEND that the District Court reduce the Etchells' award by an additional $325 in attorney's fees (2.5 hours at $130 per hour) and $301 in costs and expenses.

## F. Allocation Between Covered and Allegedly Non–Covered Claims Against the Etchells in the Main Action

■ Safeguard argues that the fees and costs recoverable by the Etchells should be further reduced because only a fraction of the litigation of the main action was devoted to claims by the Blasis that Judge Armstrong ruled are covered by the policy. More specifically, Safeguard contends that, under the District Judge's order granting summary judgment, only the claims sounding in intentional interference with a contract and negligent interference with an economic relationship were subject to the duty to defend, while the other causes of action, which sought equitable relief [23] and a judgment quieting title in

---

**21.** These eight entries, highlighted by counsel for Safeguard in Exhibit I to the Opposition filed on September 28, 1995, were made between 11/23/90 and 1/28/91.

**22.** See Etchells' Settlement Brochure, Vol. II, Ex. 22, at 051.

**23.** Counsel for Safeguard erroneously and misleadingly assert that the second amended complaint filed by the Blasis "alleged five causes of action": one for a temporary restraining order, the second for a preliminary and permanent injunction, the third to quiet title, the fourth for intentional interference with a contract and the

the Blasis' alleged easement rights were not covered.

The Etchells' response to this set of challenges by Safeguard has several components, the first of which is to argue that Judge Armstrong has already ruled that every aspect of the main action by the Blasis was subject to the duty to defend. As noted earlier, I have concluded that Judge Armstrong did not squarely address the issue presented by this challenge to the fee/cost petition, even though her Order alludes to a duty to defend "the Blasi action." Because the District Judge has not addressed the merits of this particular challenge, I must do so.

The Etchells also responded to this particular challenge by arguing that "an 'insurer waives its right to rely on defenses not specified in its denial of a claim which a reasonable investigation would have uncovered.' [citing] *Zumbrun v. United Services Auto. Ass'n*, 719 F.Supp. 890, 895 (E.D.Cal.1989); [and] *McLaughlin v. Connecticut General Life Ins.*, 565 F.Supp. 434, 451–52 (N.D.Cal. 1983)." Plaintiffs' Closing Brief Re Fees, at 12. The Closing Brief in which counsel for the Etchells advanced this argument was filed on October 12, 1995. Distressingly, this Brief makes no mention of the August 28, 1995, opinion by the California Supreme Court in *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). *Waller* essentially rejects the position advanced by the Etchells and limits dramatically the precedential viability (outside their peculiar factual settings) of *McLaughlin, supra*, and *Zumbrun, supra* (both of which involved federal courts trying to ascertain what the pertinent California law was).

■ In *Waller* the California Supreme Court expressly rejected an automatic waiver rule, declining to use waiver doctrine "to create coverage for losses that the ... policy by its terms did not cover." *Id.* at 31 and 33, 44 Cal.Rptr.2d 370, 900 P.2d 619. Under *Waller*, a carrier does not waive its ability to invoke substantive policy provisions simply because it does not mention them when it denies coverage—even if it should have known or in fact knew about their pertinence at the time of the denial. Reading together both *Waller* and *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551 (9th Cir.1991), which the *Waller* court discussed with approval, it is clear that under California law, at most, "an insurer waives defenses to coverage not asserted in its denial only if the insured can show misconduct by the insurer or detrimental reliance by the insured." *Waller, supra*, at 33, 44 Cal.Rptr.2d 370, 900 P.2d 619, describing *Intel Corp.*

■ The Etchells have made no effort to prove the required detrimental reliance. They have contended, however, that Safeguard engaged in misconduct in the handling of their claim. The evidence that the Etchells have presented to me in these fee/cost proceedings that would be relevant to determining whether Safeguard was guilty of "misconduct" [24] has been limited in character (not inappropriately)—too limited for me to fairly make a finding on this sensitive and significant allegation. Moreover, alleged misconduct by Safeguard is the subject of the Etchells' still pending claim for bad faith. Given the fact that the allegation of misconduct will be presented to a jury to decide, after a full development of the evidence in a trial, it would be inappropriate for me to prejudge that important issue in an essentially collateral proceeding like this—a proceeding whose purpose is limited to determining rights to reimbursement for certain fees and costs. I should not so invade the province of the jury; it should address the "misconduct"

---

fifth for negligent interference with a contract. Opposition, filed September 28, 1995, at 17–18.

In fact, there were only four causes of action in the second amended complaint. Appropriately, the Blasis did not separate their pursuit of a TRO and of injunctive relief into two separate causes of action; instead, they prayed in one cause of action for these sequential equitable remedies.

Counsel for Safeguard attempted to use their erroneous and artificial characterization of the causes of action as one of several bases for arguing that more than half of the underlying litigation was not covered. Whether the product of calculated overreaching or error, this element of their presentation was neither helpful nor handsome.

**24.** I am not sure that the criteria for defining "misconduct" are the same in a bad faith claim and in an argument about waiver.

issue unencumbered by any finding I might make on this much less full record.[25]

In the absence of a showing of either detrimental reliance or misconduct, California law does not permit a finding that Safeguard waived any substantive policy-based defenses by not mentioning them in its denial of the Etchells' tenders.

The Etchells have advanced one additional basis for combating Safeguard's demand for allocation *within* the defense of the main Blasi action. *Hogan* is that basis—and it provides the Etchells with powerful doctrinal ammunition. Conveniently, Safeguard ignores *Hogan* in this part of its Opposition. More specifically, Safeguard studiously avoids acknowledging the magnitude of the burden that it must shoulder, under *Hogan*, to prevail in this allocation effort. As noted earlier, the *Hogan* court declared that "any precise allocation of expenses in this context would be extremely difficult and, if ever feasible, could be made only if the insurer produces undeniable evidence of the allocability of the specific expenses". *Id.* at 564, 91 Cal.Rptr. 153, 476 P.2d 825.

Safeguard has not met that demanding burden in these proceedings. Its effort to do so suffers from several serious infirmities. First, it attempts to rely on formalistic, conclusory, and (as noted above) erroneous characterizations of the Blasis' pleading.[26] For example, Safeguard attempts to support its contention that a large percentage of litigation activity was undertaken only in connection with the Blasis' pursuit of equitable relief by pointing out that the titles (formal captions) of many of the filed documents included (among other things, one wonders?) references to the equitable relief the Blasis sought. *See* Safeguard's Opposition, filed September 28, 1995 at 19–20.

More significantly, Safeguard ignores fundamental legal realities from the underlying case. A principal predicate for the Blasis'

claims that the Etchells had acted wrongfully (as alleged in the directly covered claims) was the allegation that the Etchell's had no ownership or easement rights which would entitle them to deny the Blasis access to the disputed portion of Borel Road. Given that predicate, it was reasonable, unquestionably, for the Etchells to attempt to prove, in direct defense of the covered claims, that they had fee or easement rights in the parcel that would have made the conduct that the Blasis assailed lawful.

Similarly, it was reasonable for the Etchells to contest the Blasis' quiet title claim as part of the Etchells' effort to defeat the wrongfulness allegations. The Blasis needed to prove that they had easement rights (either by deed or by implied public dedication) in order to prove that the Etchells had acted wrongfully when the Etchells interfered with the Blasis' use of the roadway parcel. In short, the Blasis' entitlement to equitable relief turned, at the most basic level, on whether they could establish that (1) they had easement rights in Borel Road and (2) that the Etchells had no superior or parallel competing rights that would make granting the equitable relief inappropriate.

For all the reasons set forth above, I RECOMMEND that the District Court reject Safeguard's argument that defending the quiet title claim or the Blasis' pursuit of equitable relief was separable from defending the directly covered causes of action. Safeguard's showing on these issues does not even begin to approach satisfaction of the "heavy burden" of "undeniable evidence" of allocability.

 In the course of its journey through the files of "pleading" in the underlying action Safeguard suggests that expenses incurred in connection with contempt proceedings initiated by the Etchells and sanctions proceedings initiated by the Blasis also are clearly allocable to claims not sub-

---

**25.** See the comments about the character and limits of the evidentiary base for this Report in footnote 1, *supra.*

**26.** The term "pleading" is a phrase of art whose reach is limited to complaints, answers, counterclaims, replies to counterclaims or, when ordered, replies to answers or third-party answers,

cross-claims, answers to cross-claims, third-party complaints, and third-party answers. *See* F.R.Civ.P. 7. Safeguard's Opposition misuses this term regularly, assuming that it also covers motions, discovery papers, and other pre-trial filings.

ject to the duty to defend. These suggestions also are wide of the legal mark. As we have already pointed out, California courts have made it clear that when a carrier wrongfully denies tender of a defense it loses the right to make determinations about the most appropriate *manner* to conduct the litigation. It is not clear that the contempt proceedings do not fall within the broad band of actions that might reasonably be deemed integral to vigorous defense of the underlying claims. And no lawyer could responsibly have exposed his clients to substantial monetary sanctions by refusing to defend them against the Blasis' motion, at least one major basis for which turned on the Etchells' earlier effort to disqualify the trial judge, an effort that Safeguard concedes falls *within* its reimbursement obligations under Judge Armstrong's ruling on the motion for summary judgment. *See* Opposition, at 20. Given the magnitude of the burden the law imposes on carriers in this situation, and given the breadth of the zone of matters that could be considered tactically appropriate in defense of an action like this, Safeguard has failed to make a sufficiently persuasive showing that either of these dimensions of the underlying action should be deemed outside the boundaries of reimbursable defense expenses.

The remainder of Safeguard's effort to justify allocation to uncovered claims focuses on costs and fees incurred in connection with depositions. Given the dispositions I have recommended, above, of other challenges to the Etchells' fee/cost claim, it is not necessary to consider at length Safeguard's arguments [27] about allocation of deposition expenses. I already have recommended that costs and fees incurred before the Etchells tendered defense of the Blasi action not be allowed. Eleven of the fifteen depositions in issue here were taken before that tender, so no fees or costs would be recoverable for them. The twelfth deposition was of Michael Mahoney, whose role was confined to trying

to prove damages on the cross-complaint. I recommended, above, that no fees or costs connected with his deposition be recoverable. The remaining three depositions, according to uncontradicted averments by counsel for Safeguard, were taken in the condemnation proceedings. I already have denied recovery of the expenses claimed in connection with these depositions by ruling, above, that the duty to defend the underlying action is not broad enough to embrace the condemnation proceeding. Thus, even if they had been persuasively made, Safeguard's attacks on the deposition expenses would have no net effect on the fee/cost award.

Based on all the considerations set forth in the paragraphs in this section, we conclude that Safeguard has not met its heavy allocation burden under the *Hogan* test; it has failed to prove, by undeniable evidence, that the Etchells incurred expenses that were attributable solely to the allegedly non-covered claims in the Blasis' complaint in the main action. It follows that I RECOMMEND that the District Court reject this proffered basis for reducing the fee and cost award to the Etchells.

### G. Allocation Between Defense of the Etchells and Defense of the Delagnes

 Pointing out that Edwin Wilson represented both the Etchells, who were insureds under Safeguard's policy, and the Delagnes, who were not, through all phases of the Blasi litigation, Safeguard contends that the fee and cost award that the Etchells seek under their policy should be reduced by 50%. This follows, according to the carrier, because no one even contends that Safeguard had any duty to defend the Delagnes. The Etchells respond by asserting that this ground for Safeguard's attack should give rise to no reduction at all in the fee and cost award—principally because Wilson would have done everything reflected in the fee and cost petition even if the Delagnes had not been parties to any of these proceedings and

---

**27.** If my other recommendations did not make it unnecessary to reach these arguments, I would reject at least a substantial portion of them on the ground that it clearly was reasonable, as an integral part of the defense of the tort claims against the Etchells, to litigate vigorously the competing claims to title and easement rights in Borel Road. Under the controlling California law, expenses incurred litigating title and easement issues are not allocable solely or even primarily to uncovered claims.

if the sole interests being defended were the Etchells'.

Again we must begin our effort to resolve this dispute by trying to identify the applicable analytical framework. Safeguard's papers ignore this question entirely, and the Etchells' papers simply assume that the *Hogan* test applies. Again, we could find no reported opinion from a California court that addressed this issue.

Left to our own devices, we have concluded that *Hogan* is applicable. We base this conclusion in part on the fact that Judge Armstrong already has ruled that Safeguard wrongfully denied that it had any duty to defend and in part on the nature of the Etchells' primary response to this challenge. The Etchells claim that they would have litigated these matters the same way, incurring the same fees and expenses, even if the Delagnes had not been named as parties in any of the claims or cross-complaints. Since there is nothing patently vapid or frivolous about this assertion by the Etchells (in other words, this assertion is not transparently inconsistent with the evidence before me), it seems appropriate to place the burden on Safeguard—and to permit it to escape liability only for those fees and costs, if any, that it can clearly show would not have been incurred if the Delagnes had not been named as parties.

We begin by acknowledging that Edwin Wilson in fact represented both the Delagnes and the Etchells in all of the proceedings that we have been examining. In the main action, both the Etchells and the Delagnes were named defendants and cross-complainants; both also were named defendants in the eminent domain proceeding. With one apparently inadvertent exception,[28] Wilson filed all pleading in both actions on behalf of both the Etchells and the Delagnes.

It also is true that the Delagnes were more than nominal defendants in the main action— at least in the sense that evidence about their conduct and about the state of their knowledge was introduced and attended to by the trial judge, and in the sense that the trial court not only held that the Delagnes' easement did not prevent the Blasis' intended use of the road, but also imposed a damages judgment against the Delagnes (and the Etchells) for some $154,000, plus a sizable amount of interest.[29] In justification of that judgment, the trial judge pointed, albeit very briefly, to different acts by each of the four defendants. She mentioned specifically the Delagnes' efforts to have a parcel number assigned to the disputed portion of the roadway and the fact that Gilbert Delagnes helped Robert Etchell erect the first road-blocking gate.

The records from the underlying action, however, as well as Edwin Wilson's testimony at the hearing on this matter, strongly support an inference that, despite some outward appearances, it was the Etchells' interests and actions around which the underlying action was really centered. The focus of the litigation was on the Etchells' title claims and on the Etchells' efforts (physical, political, and legal) to prevent the Blasis from completing their project. The Delagnes claimed only a use-easement in the roadway, and apparently never made a serious effort to prove that their rights were sufficient to prevent the Blasis from installing utilities and improving the roadway. Gilbert Delagnes never tried to prove during the litigation that he was an owner in fee, or that he had exclusive possessory interests in the property. And while he had helped Robert Etchell put up the first gate, he had no further physical involvement after the Blasis promptly took that gate down. It was Robert Etchell, on his own, who erected the gate the second time and who parked the vehicle behind it. Thus it was Robert Etchell's conduct that forced the Blasis to initiate the litigation.

---

28. The "Answer to Complaint for Eminent Domain" formally was filed only on behalf of the Etchells—but the case proceeded against the Delagnes as well, and Wilson never claimed not to represent both couples throughout. *See* Vol. III (Eminent Domain) of the Clerk's Trans. on Appeal, at 000119.

29. The court also enjoined both the Etchells and the Delagnes from interfering with the Blasis installation of utilities and improvements.

And after the suit was filed, it was Robert Etchell, alone, who allegedly threatened, repeatedly, to tear out the utilities that the Blasis had installed. It was those alleged threats, and the fact that the police refused to intervene without clearer directives from the judge, that drove the Blasis to seek further equitable intervention by the court.

Even more significantly, it was Robert Etchell who, at about the time the litigation commenced, purported to acquire ownership rights (title and power of exclusive possession) in Borel Road through quit-claim deeds from apparent heirs of earlier owners. Those alleged ownership and possessory rights clearly consumed much more litigation resources than any of the appreciably more limited rights that the Delagnes claimed. In fact, the documentary record supports Edwin Wilson's written and testimonial contention that the importance of the Delagnes to the proceedings did not arise primarily from their conduct or from any legally cognizable interests they may have had in the roadway, but from their deep personal knowledge about the history of the use of the disputed parcel. In other words, they were important primarily as sources of evidence.

It is clear that a large percentage of the litigation was devoted to probing the two principal bases on which the Blasis' rights allegedly depended: their claim to an easement by deed and their contention that the roadway had been impliedly dedicated (by actions of prior owners and by acquiescence in patterns of use by others) to public use. It is clear that the Etchells would have had to litigate these central issues just as fully as they in fact litigated them whether the Delagnes had been parties or not. Similarly, the Etchells would have had to work closely with the Delagnes, and would have needed to call them as witnesses, even if the Delagnes had not been named parties. The Etchells needed help from the Delagnes to develop evidence to attack the Blasis' theories of

entitlement and to bolster the Etchells' easement and fee claims.

In sum, it is clear from the record that the central focus of the underlying litigation was on competing claims about chains of title (pitting the sources of the Blasis' easement by deed against the sources of the Etchells legal interests) and on the alleged implied public dedication—and there is no basis in the record for inferring that counsel for the Etchells could or would have litigated those dominating matters any differently if he had not also been representing the Delagnes.

These facts about the center of the underlying litigation are one source of support for my conclusion that Safeguard should be able to escape liability for fees and costs on the ground that Wilson also represented the Delagnes only if it can satisfy the demanding allocation test articulated in *Hogan*. There is additional support for this conclusion in the following considerations.

First, with the exception of $328.00 that was drawn from an apparently small (perhaps $500) trust account that the Delagnes set up with Wilson's office,[30] the Etchells bore all the costs of the underlying litigation. Wilson testified that he never billed the Delagnes for any of his services, that he never had a fee arrangement with them, that they did not have the financial resources to help fund the defense or the cross-complaint, and that he never expected any financial support of the litigation from them. Instead, he billed only the Etchells—and he looked solely to them for costs and fees.

Second, it appears from Wilson's records and testimony that the vast majority of the consulting with "clients" that he did with respect to these proceedings was with the Etchells—who had been clients of his with respect to other matters for a good many years. By Wilson's account, the Delagnes were peripheral players in all aspects of this

30. On March 26, 1990, well before the tender of this matter to Safeguard, Wilson's office credited to the Etchells' account on this litigation a $328.00 contribution "from Delagnes Trust Acct." Settlement Brochure, Ex. 22, at 037, and Exhibit 25 for the October 27, 1995 hearing before the undersigned on this matter, second to last page, last row. During the hearing, Ms. Etchell testified that she thought that the Delagnes had deposited no more than about $500 in this trust account. It was clear from Mr. Wilson's testimony that he had no recollection of any trust account for the Delagnes at all—and that he either never knew about this small contribution or never expected any additional contributions from this source.

'drama'—players whom he agreed to represent primarily for tactical and social reasons (apparently the Etchells and the Delagnes had been friends and neighbors for a considerable period; the Etchells did not want to abandon the Delagnes and leave them exposed to an adverse judgment; and Wilson did not want the Delagnes to turn, as witnesses, against the Etchells).

Third, at the conclusion of the proceedings at the trial court level, the Blasis insisted that the Etchells go through the process of executing sizable and fairly elaborate undertakings (bonds) to secure the damages judgment pending appeal [31]—but no undertakings of any kind were demanded of the Delagnes. Thus it appears that the Blasis were looking only to the Etchells for satisfaction.

Given all the considerations described in the preceding paragraphs, it is clear that, at a minimum, the Etchells would have incurred in the underlying litigation the vast majority of the fees and costs that Wilson billed to them (and that they claim here) even if the Delagnes had never been named as parties. Because of the clarity of that fact, Safeguard should be permitted to avoid liability only if it could demonstrate by at least clear and convincing evidence that specific costs or fees would not have been incurred but for the fact that Wilson also represented the Delagnes.

Safeguard has made no such showing. It has not isolated a single expenditure that would not have been made if the Delagnes had not been parties. Instead, Safeguard has simply asserted that because the Delagnes constituted 50% of the people Wilson represented in the underlying proceedings, and because they were the subject of some evidence and of adverse judgments, the Etchells' fee and cost award should be reduced by 50%. This kind of generalized argument falls far short of satisfying the *Hogan* test.

Because Safeguard has presented none of the specific and clear allocation proof that California law requires in this setting, I RECOMMEND that the District Court decline to make any reduction in the fee and cost award in response to that part of Safeguard's challenge that is based on the fact that Wilson also represented the Delagnes.

## V. SUMMARY OF FINDINGS AND RECOMMENDATIONS

After adjustments they made during the October 27, 1995, hearing, the Etchells have claimed an entitlement to $227,409.67 in reimbursement for fees and costs incurred in the underlying litigation.[32]

The Etchells proved that the hourly rates on which these charges are based are reasonable.

I summarize here the disposition that I RECOMMEND for each of the separate challenges pressed by Safeguard.[33]

1. The Etchells are not entitled to recover fees or costs that they incurred in any of the underlying proceedings (judicial or local governmental) before they tendered defense of the main action on September 4, 1990. The District Court should not include in their award the $31,791.25 they claim for the pretender period.

2. The Etchells are entitled to recover fees and costs incurred after the Court of Appeal reversed the damages award against them. The District Court should not reduce their award based on this challenge.

3. The Etchells are entitled to recover for fees incurred preparing for a possible appeal to the Supreme Court of the public dedication issue. The District Court should not reduce their award based on this challenge.

4. Safeguard has proved that $4,439.50 in fees and costs is clearly allocable to work

---

**31.** *See* second to last exhibit, unnumbered, in the Etchells' "Response to October 30, 1995 Order Re Evidentiary Hearing," received on November 3, 1995 in a separate spiral binder.

**32.** As stated in the text, we arrive at this figure by subtracting the amount billed for work performed on these matters by Frances Etchell ($10,413.25) from the original claim ($237,822.92).

**33.** Except as expressly noted in the text, Safeguard has not challenged any of the components of the Etchells' bill of costs. If Safeguard had any arguments that certain items of cost are not recoverable under the applicable statutes and court rules, it has waived them.

only on the eminent domain action, so the Etchells' award should not include that sum.

5. Safeguard has proved that $678.00 in fees and costs is clearly allocable to work only on the cross-complaint, so the Etchells' award should not include that sum.

6. Safeguard failed to prove that any of the claimed fees or costs were clearly allocable only to work on allegedly non-covered claims by the Blasis in the principal underlying lawsuit. The District Court should not reduce the Etchells' award based on this challenge.

7. Safeguard failed to prove that any of the claimed fees or costs were clearly allocable only to representation of the Delagnes. The District Court should not reduce the Etchells' award based on this challenge.

A substantial component ($45,566.69) of the Etchells' original claim in these proceedings consisted of prejudgment interest. Because the Etchells have withdrawn their claim for paralegal fees (the $10,413.25 in billable time attributed to Frances Etchell's work on these matters), and because I have recommended that various other charges totalling $36,908.75 not be included in the base award on which interest (running from various points in time) should be calculated, the parties must re-calculate the interest component of the Etchells' claim. I recommend that the District Court order that re-calculation after the District Court has considered and ruled on any timely challenges the parties may make to the findings and recommendations made here.

IT IS SO REPORTED AND RECOMMENDED.